## GARRETT v. THE KANSAS CITY COAL MINING COMPANY, et al., Appellants.

### Division Two, December 31, 1892.

1. **Contract to form Corporation:** FICTITIOUS STOCK: PUBLIC POLICY: EQUITY. An agreement that the whole capital stock of a proposed corporation should be paid in full by transferring to it coal lands for which the parties to the agreement had options and contracts and by services rendered in its promotion, that the corporation should then issue $300,000 in bonds secured by mortgage on the corporate property, and that, with the proceeds thereof, the land should be paid for and the promoters should be repaid all money advanced in satisfying the land contracts and options and the expenses of buying the land and organizing the corporation, the residue to be applied in developing the coal. *Held*, that such contract is contrary to public policy, and one which a court of equity will not enforce.

2. ————: ————: CORPORATION OF SISTER STATE: LAWS OF THE FORUM. Such contract must be interpreted in the light of the constitution and laws of this state, although the corporation was organized under the laws of the state of Kansas, it appearing that the contract was made and was to be performed in this state, that the property which was its subject-matter was situated in this state; the laws of Kansas not having been introduced in evidence and there being nothing to show that it was agreed that the corporation should be organized under the laws of that state.

3. ————: ————: CONSTITUTION: STATUTE. Under the constitution and laws of this state (Constitution, art. 12, sec. 8, and Revised Statutes, 1889, sec. 2499), the property or labor received for stock of a corporation must be reasonably worth the money subscription.

4. ————: ————: ULTRA VIRES. A contract that a corporation, when organized, shall issue stock as fully paid up, when in fact the contemplated payment is intentionally fictitious is an agreement to perform an act which is *ultra vires* and one which equity will not enforce.

5. ————: ————: PARTIES IN PARI DELICTO. Where the parties to such illegal agreement stand *in pari delicto*, neither one can enforce it against the other.

6. ————: ————. The fact that the contract involved in this case provided for turning over the land at actual cost could make no difference as to its validity, since it was apparent on the face of the contract that the land and services were not a fair equivalent for the stock to be issued.

*Appeal from Jackson Circuit Court.*—HON. JAMES GIBSON, Judge.

REVERSED.

*Warner, Dean & Hagerman* for appellants.

(1) The clear preponderance of the testimony is, that Garrett had failed to carry out his agreements with Perry, Smith and Long, and that he and Wilson had lost all rights under their original agreement made with the former. This was established by not only the testimony of each and all of the defendants, but by the unquestioned evidence of several disinterested witnesses. For this reason the plaintiff is not entitled to recover. (2) The plaintiff acted in bad faith in obtaining the agreements upon which he founds his action for equitable relief. For this reason, he is not entitled to any consideration in a court of equity. His statements to the defendants, in order to induce them to unite with him in making the agreements declared on, were so manifestly incorrect and untrue that, for that reason the agreements ought not to be enforced. (3) The question then resolves itself in this shape: A agrees with B, C and D to purchase certain lands, and, when acquired, to convey them to a corporation with a definite amount of capital stock, which capital stock is to be distributed in an agreed proportion between them. Subsequently B, C and D refuse to carry out this agreement, and they organize a corporation of their own and convey whatever interest they then have or thereafter acquire in the land to that corporation. Does this state of facts make A in equity a stockholder in a corporation thus formed? See the following authorities: *Morrison v. Mining Co.,* 52 Cal. 306; *Penn Match Co. v. Hopgood,* 141 Mass.

145; *Hawkins v. Mining Co.*, 52 Cal. 513; *Cormody v. Power*, 60 Mich. 26; *Gent v. Ins. Co.*, 107 Ill. 659; *Stowe v. Flagg*, 72 Ill. 397.

*Lipscomb & Rust* for respondent.

(1) A court of equity will enforce the specific performance of a contract to deliver shares of stock, where, as in this case, the value of the property is undeveloped, the value of the stock not definitely ascertainable, and where plaintiff cannot procure other shares of the same stock. Morawetz on Private Coporations [2 Ed.] sec. 218, 219; Cook on Stocks and Stockholders [2 Ed.] sec. 338. (2) Plaintiff had a right, even aside from the question of fraud, to sue this corporation, by reason of his contracts with its promoters. Morawetz on Private Corporations, sec. 549; 79 Pa. St. 54. (3) The evidence showed that the corporation was formed and the property conveyed to it with full knowledge by its officers and the other defendants of plaintiff's claims. "He who takes the benefit of a contract must assume its burdens." Redfield on Railways [5 Ed.] p. 18. In *Railroad v. Perry*, 37 Ark. 187, the court say: "Whenever a third party enters into a contract with the promoters of a railroad, which is intended to inure to the benefit of the corporation, and it takes the benefit of the contract, it will be bound to perform it." *Bommer v. The American Co.*, 81 N. Y. 473; *Titus v. Railroad*, 5 Phil. 172; *Low v. Railroad*, 45 N. H. 375; 10 Barr (Pa.), 278. (4) As to the effect of the answer, in the nature of equitable bill of interpleader filed by the coal company in case at bar, see *Williams v. Harbor Co.*, 2 De Gex and Jones, 547.

MACFARLANE, J.—This is a suit in equity to compel the defendants, a corporation, and its shareholders and directors, to issue to plaintiff certain shares of stock in said corporation and to register the transfer of such shares in the books of the corporation.

The petition charges that on the twentieth day of April, 1888, he and defendants, Perry, Smith and Long, owned and held contracts on large quantities of coal land in Morgan county, comprising the "Stover Coal Mines" and other land; that on that day he, said Perry and Smith entered into contract with one E. E. Wilson, by which it was agreed that Wilson should organize a corporation with a paid up capital of $1,000,000, for the purpose of completing the purchase of said land and developing the mines. That Wilson for his services was to have $440,000 of the stock and plaintiffs, Perry and Smith, the balance of $560,000.

The petition charged further that said Wilson had organized the corporation under the laws of the state of Kansas, and he is president, and said Perry, Smith and Long, together with B. P. McNair and said Wilson, are shareholders and directors, and hold a controling interest therein; that by a contract dated April 17, 1888, it was agreed that plaintiff was to have out of the $560,000 of the stock shares of the face value of $425,606.72 and that said Perry, Smith and Long were to have the balance of shares of the face value of $134,393.28; that defendants refused to issue said stock to him, but threaten to issue the whole to the said Perry, Smith, Long and said McNair.

The answer of defendants Perry, Smith, Long and McNair charged that plaintiff had agreed to advance one half the money to make payments on the land to avoid forfeiture of contracts, that they paid $15,400 in cash towards payment of the land, and plaintiff had neglected and refused to pay any part; that

when they went into the enterprise with Garrett, he represented that he already had a corporation organized with a capital of $250,000, to purchase said lands, all of which was subscribed, which representations were false; that afterwards plaintiff represented that he had made arrangements with E. E. Wilson to organize a corporation with $1,000,000 capital and would issue and sell lands sufficient to repay them for their advances and for the purchase and payment for other land amounting in all to ten thousand acres; that on the strength of these representations, and a promise by plaintiff that he would assume the payment of $15,000 due to Anthony Arnold as commission for the purchase of some ten thousand acres of land, they entered into the contract mentioned in the petition.    They charged that plaintiff wholly failed to perform and carry out his undertakings, and in order to protect themselves from loss of the money they had advanced they entered into the organization of a new corporation.

The defendant corporation admitted that it was a corporation organized under the laws of Kansas, with a capital stock of $1,000,000, that Perry, Smith, Long and McNair claim the same stock demanded by plaintiff; had no information in regard to the contracts and asks the court to adjudicate as to the ownership of the stock.

We are asked in this suit to enforce the specific performance of a contract, made among the promoters of a corporation before, but in contemplation of, its organization.    The corporation is asked to issue to complainant paid up capital stock of the face value of about $325,000.    The first written agreement found in the record is made by plaintiff and defendants, Long, Perry and Smith, and bears date April 17, 1888.    It provides that Perry, Long and Smith are "to have in full for their payment and services in the matter of the

Morgan county land, comprising about ten thousand acres, bought as contemplated, $160,000, out of. the capital stock of a company to be organized; said stock to be issued under the Wilson agreement, subject to proposed incumbrance." It was "further agreed that *all money expended* in the purchase and development of said land is to be *refunded to the persons having paid the same*, if the Wilson agreement is consummated. Said Wilson agreement is that said Wilson is to assume the contracts and obligations of the parties hereto and organize a coporation with a *paid up* capital stock of $1,000,000, *said land* representing the *entire assets* of the corporation; and said Wilson is to have $333,300, of said stock and $300,000 in bonds, for which he is to furnish said corporation $300,000."

The Wilson agreement referred to as the basis of this one was reduced to writing and signed by Wilson Smith, Perry and plaintiff at Kansas City, Missouri, April 25, 1888. This is the contract, a specific performance of which is invoked, and is as follows:

"This agreement witnesseth: That, whereas L. C. Garrett, L. C. Smith, J. W. Perry and others have an interest in and contracts and options for from six thousand to ten thousand acres of coal land in Morgan county, Missouri; and

"Whereas they are desirous of forming a corporation for the purpose of completing the purchase of said lands and developing the same, and securing the services of Edwin E. Wilson to that end.

"Now it is hereby further agreed, between said first mentioned parties of the first part and said Wilson of the second part, that a corporation shall be organized with a paid up capital of $1,000,000, said capital to be represented by the value of the lands owned and contracted for by said party of the first part.

"That at once, on the organization of its said corporation, said corporation shall acquire title to the lands above referred to, shall issue bonds to the amount of three hundred thousand ($300,000) dollars, secured by mortgage on the said lands and coal plant. The amount of money obtained by the sale of the aforesaid bonds to be used in acquiring title to said land, and developing the same as a coal producing property.

"Said Wilson shall become the financial agent of said corporation for the sale of its said bonds, and agrees to take over and sell the same at par, and to furnish money on account of the same to meet the requirements of said corporation in paying for said lands and developing its said property, and account for and turn over to the corporation at once all moneys received on account of said bonds.

"Said lands are to be turned over to said corporation at actual cost price, as had from the original owners, together with such reasonable commissions as have been agreed to be paid by said party of the first part, which said corporation shall pay.

"Said Wilson is to have the management of said corporation when formed, subject to the control of the board of directors, to be eleven in number, five named by Wilson, five by said first party, and one by the ten chosen.

"In consideration of all of which said Wilson is to have four hundred and forty thousand ($440,000) dollars of the stock of said corporation, the balance of the stock to belong to the parties of the first part."

From the testimoney of the witnesses it is established beyond a doubt that under the agreements the whole capital stock of the proposed corporation should be paid in full, by turning over to it the lands for which the parties had options and contracts, and for services

rendered in its promotion; that the corporation should then issue $300,000 in bonds secured by mortgage on the corporate property and with the proceeds the land should be paid for, the promoters should be *repaid all money advanced* in paying on land contracts and option, and expenses of buying the land and organizing the corporation; and the balance should be applied in developing the mines.

Now assuming that the defendant corporation, organized under the laws of the state of Kansas, is the out-growth of the contract in question, and that plaintiff performed fully all his obligations under said contract, is he entitled to the relief sought in this suit?

Under the constitution and laws of this state, no corporation has the power "to issue stock or bonds except for money paid, labor done or property actually received; and all fictitious increase of stock or indebtedness shall be void" (Constitution of Missouri, sec. 8, art. 7; Revised Statutes, 1889, sec. 2499); and five per cent at least of every subscription shall be paid *in money* at the time of subscribing therefor, "and no subscription shall be received or taken without such payment."

This contract was made in this state. The property which was the subject-matter thereof was situate in this state. The agreement was to be performed in this state, and it does not appear that the corporation should be organized under the laws of the state of Kansas, nor were the laws of that state introduced in evidence. The contract must be interpreted in the light of the constitution and laws of this state.

When the constitution permits a subscriber to pay for stock by labor done or property actually received, it means that the corporation must receive, in labor or property, what it was reasonably worth in money. The same rule obtains in the absence of statutory authority.

VOL. 113—22

Corporations must own property for the purposes of their legitimate business, and it would be but a useless formality to receive the money in payment for the stock and return it again in payment for the property. That formality is not required, but as is said by Lord Justice GIFFARD in *Drummond's Case*, 4 Ch. App. 772: "If a man contracts to take shares he must pay for them, to use a homely phrase, 'in meal or in malt;' he must either pay in money or in money's worth." Cook on Stock & Stockholders, sec. 13; 1 Morawetz on Private Corporations, sec. 428.

To the same effect are the decisions in this state. The property or labor must be a "fair, just, lawful and needed equivalent for the money subscribed." *Liebke v. Knapp*, 79 Mo. 24; *Shickle v. Watts*, 94 Mo. 414; *Chouteau v. Dean*, 7 Mo. App. 210.

No one can read the contracts and evidence in this case, and not be thoroughly convinced that the whole scheme, if consummated, would be contrary to public policy, a fraud on future purchasers of the stock, and in the face of the positive mandates of the constitution and laws of the state. No cash payment whatever was to be made, indeed the expenses of organization were to be refunded. $300,000 of bonds were to pay for the land, and develop the property, which was put into the corporation at $1,000,000. Wilson, for selling the bonds and organizing the corporation, was to get paid up stock of the face value of $440,000, and the company was to issue to the plaintiff in exchange for his equities in "contracts and options," upon which he had advanced but little if any money, paid up capital stock of the face value of from $300,000 to $400,000. There is no difficulty here, as is sometimes the case, in determining whether there was an over valuation of the property or labor. The inequality between the value of what plaintiff has put

into the corporation and what he demands from it is so great as to shock the conscience.

The contract that the corporation, when organized, should issue stock as fully paid up, when in fact the proposed payment was intentionally fictitious, was an agreement that it would perform an act *ultra vires*, and which a court of equity will not enforce. *Tobey v. Robinson*, 99 Ill. 233; *Railroad v. Mowatt*, 12 Jur. pt. 1, 407; *Le Warne v. Meyer*, 38 Fed. Rep. 191.

Plaintiff and the other defendants who were parties to the illegal agreement stand *in pari delicto*, and neither can enforce the contract against the other. *Green v. Corrigan*, 87 Mo. 370; *Kitchen v. Greenabaum*, 61 Mo. 116.

It is no answer to these objections that the contract makes provision that the lands shall be turned over to the corporation at actual cost. It is apparent from the face of the contracts that the land and the services to be rendered by the promoters, taken together, were nothing like a fair equivalent for the face value of the stock to be issued. It does not matter whether the value of the land or the services were fictitious; both were provided by the contract under which plaintiff claims. That the stock of the corporation demanded by plaintiff would be largely fictitious, and that no payment in money is required under the contract, is manifest.

Neither are we embarrassed in this case with questions of estoppel, which might arise were we dealing with an unauthorized and *ultra vires* contract which had already been executed by the corporation and stockholders. Here we are asked to require the corporation to perform an executory contract between others which it would have had no authority itself to make. This we cannot do. Judgment reversed. All concur.