POLLITZ v. WABASH RAILROAD CO. et al. (No. 6732.)

(Supreme Court, Appellate Division, First Department. April 9, 1915.)

1. CORPORATIONS ⬯71—STOCK—ILLEGAL ISSUE—RATIFICATION.

The issuance of preferred stock of a railroad company without the unanimous consent of all the stockholders, expressly prohibited by Const. Mo. art. 12, § 10, under the laws of which the corporation was organized, could not be ratified by a majority of the stockholders, since the provision itself defines the extent of the ratification required.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §ʹ447; Dec. ⬯71.]

2. CORPORATIONS ⬯71—PREFERRED STOCK—ISSUE—CONSTITUTIONAL PROVISION.

The provision of Const. Mo. art. 12, § 10, that no corporation shall issue preferred stock without the consent of all the stockholders, is not limited to an original issue of preferred stock, as distinguished from an issue of increased preferred stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 447; Dec. Dig. ⬯71.]

3. RAILROADS ⬯15—STOCK—FICTITIOUS ISSUE—CONSTITUTIONAL AND STATUTORY PROVISIONS.

Under Const. Mo. art. 12, § 8, providing that no corporation shall issue stocks or bonds, except for money paid, labor done, or property actually received, and that all fictitious increases of stock or indebtedness shall be void, and Const. Ill. art. 11, § 13, and Comp. Laws Mich. § 6344, both to the same effect, subject to which defendant railroad was doing business, its refunding plan, whereby it issued refunding mortgage gold bonds, and for each $1,000 par value of two series of outstanding debenture mortgage bonds issued a certain par value of the new bonds and a certain par value of its preferred and common stock, so that for a total of $28,744,000 par value of the debenture bonds a total of $51,271,000 par value of the new securities was issued, and, on the computations on which the plan was based, the average value of the new securities was 88⅔, as against 83 for the old bonds, was an overpayment for the old bonds and an issue of new securities at below par, and was invalid.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 31; Dec. Dig. ⬯15.]

4. RAILROADS ⬯150—STOCK — REFUNDING PLAN — EVIDENCE — EQUIVALENT VALUE.

In a representative action by a stockholder of a railroad company to annul as ultra vires an arrangement between the company, through its directors, and the holders of an issue of $30,000,000 debenture mortgage bonds, for the refunding and exchange thereof for new securities, evidence held not to warrant a finding that the property and pecuniary value of the considerations received by the railroad for the new securities were fairly equivalent to the par value of the securities so issued.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 461, 462; Dec. Dig. ⬯150.]

5. RAILROADS ⬯17—STOCKHOLDER'S SUIT—RELIEF—ACCOUNTING BY DIRECTORS TO CORPORATION.

The wrong sought to be redressed was the restoration of the company's funds to its treasury, and plaintiff was not entitled to any direct personal relief, and where the refunding plan was illegal and void the individual directors actively participating therein, as officers and agents of the corporation, were accountable to the railroad company for the damages which it had sustained by reason of their illegal acts.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 36–38; Dec. Dig. ⬯17.]

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. RAILROADS ⬳17 — STOCKHOLDER'S SUIT — ACCOUNTING BY DIRECTORS — MEASURE OF DAMAGES.

The damages to the corporation by reason of the acts of such directors, for which they were accountable to it, was the amount paid on the interest coupons on the refunding mortgage bonds issued in exchange for the old debenture mortgage bonds, with interest to the time of trial, amounting to $5,133,809, and interest thereon from the date of trial; and it would be assumed that the company would protect its rights and those of its stockholders by interposing the defense of invalidity to the foreclosure of the refunding mortgage bonds, and the fact that such bonds and refunding securities were so mingled with the company's other securities that they could be identified only with great difficulty did not create any liability on the part of the directors.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 36–38; Dec. Dig. ⬳17.]

Appeal from Special Term, New York County.

Suit by James Pollitz against the Wabash Railroad Company and others, impleaded with the Equitable Trust Company of New York. Judgment for plaintiff that defendants Edward T. Jeffery, Winslow S. Pierce, and George J. Gould account to the defendant railroad company for damage sustained by plaintiff as a stockholder in such company, and plaintiff appeals, and certain defendants take a cross-appeal. Modified.

See, also, 157 App. Div. 911, 142 N. Y. Supp. 1140; 176 Fed. 333, 100 C. C. A. 1.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and DOWLING, JJ.

J. Aspinwall Hodge, of New York City, for appellant.

Rush Taggart, of New York City, for cross-appellants.

George Wellwood Murray and John Quinn, both of New York City, for respondent.

DOWLING, J. Cross-appeals by the plaintiff and certain defendants from a judgment that the defendants Jeffery, Pierce, and Gould account to the defendant railroad company for the damage sustained by plaintiff as a stockholder in said company, which damage was determined as equal to the sum he would be entitled to receive on such accounting, and was fixed at the sum of $31,183.50, being the amount of $21,000 paid by plaintiff for his stock, with interest from June 13, 1906, which sum was adjudged to be paid directly to plaintiff, with his costs; that the railroad and its directors who had been served be enjoined from issuing further stock and bonds in exchange for outstanding bonds according to a certain refunding scheme; and that the complaint be dismissed as to the other defendants.

This action is brought by the plaintiff, as a holder of 1,000 shares of the common stock of the Wabash Railroad Company, suing on his own behalf and that of all the other stockholders similarly situated, to annul and set aside as ultra vires an arrangement between the company, through its directors and the holders of an issue of $30,000,000 debenture mortgage bonds, for the refunding and exchange thereof for new securities. The defendant Wabash Railroad Company was or-

ganized in May, 1889, by the consolidation of Ohio, Michigan, Indiana, Illinois, and Missouri companies, under consolidation laws in each state, the general tenor of which is indicated by the provisions of the Missouri Constitution (article 12, § 18):

"Consolidation of Foreign Companies.—If any railroad company organized under the laws of this state shall consolidate by sale or otherwise with any railroad company organized under the laws of any other state or of the United States the same shall not thereby become a foreign corporation; but the courts of this state shall retain jurisdiction in all matter which may arise, as if said consolidation had not taken place. * * *"

The consolidated company was organized as to detail under the laws of Ohio. At the organization the consolidated company had $24,000,000 par preferred stock and $28,000,000 par common stock. Its mileage was about 2,237 miles. In October, 1889, with the consent of all the stockholders, the consolidated company made a mortgage to the Mercantile Trust Company, as trustee, dated July 1, 1889, creating a junior lien upon portions of its property to secure an issue of $30,000,000 of debenture mortgage bonds, whereof $3,500,000 were designated as "Series A," and were a preference in respect to the payment of interest, and were due and payable in 1939, but were redeemable at the option of the company at par within 20 years from their date, after the lapse of 5 years from the date of their issue. The remaining $26,500,000 were in Series B, which were due and payable in 1939, but payment might be deferred by the owner failing to demand the same when due. Both series bore interest at the rate of .6 per cent., payable semiannually, on January 1st and July 1st, "from the net income of the said railroad company, ascertained and declared by its board of directors to be applicable to such interest payments."

The mortgage provided that the board of directors should ascertain the amount of net income so applicable by deducting from the gross earnings of the company all current expenses for operating, and "such sums as in the judgment of said board of directors may be necessary to maintain and renew said road and its equipment and appurtenances and to keep the same in good condition and to increase its equipment to such extent as may be commensurate with its business requirements, and to pay taxes, rentals, interest, and sinking fund installments accrued or to accrue on any and all mortgages existing on the property hereby conveyed, and to satisfy all liens and charges thereon that are or may be prior in equity to this mortgage." From the net income, thus ascertained, the directors were to set aside an amount sufficient to pay the 6 per cent. on these bonds, and, if the net income did not suffice so to do, it should be applied as soon as it amounted to 1 per cent. It was provided that such interest should not be cumulative, and that no part thereof unpaid in any year be paid from the income of any other year. The railroad company also gave to the registered holder of the bonds:

"And will secure to him so far as it lawfully may the right to cast one vote for each one hundred dollars par value hereof, at all meetings of its stockholders."

The board of directors was to be elected, one-half by the bondholders and one-half by the stockholders, with a thirteenth director

to be chosen by the directors already elected, and, if they could not agree, then he was to be selected by the trustee of the mortgage. In so far as it sought to give the bondholders the right to vote for directors, the provision of the mortgage was in violation of the Constitution of the state of Illinois, as then and since in force (article 11, § 3).

At this time there were two mortgages on the property of the railroad; the first being for $33,900,000, and the second for $14,000,000. Then came the debenture mortgage referred to, for $30,000,000. There was an issue of preferred stock, amounting to $24,000,000, and the common stock, $38,000,000. The road did not have sufficient capital to meet the constant demands upon it for improvements and extensions to meet competition, and it used all its earnings for that purpose, after paying interest on the first and second mortgages, expending in that manner in 1905 the sum of $2,500,000. During the years from 1889 to 1905 the company had paid interest irregularly on the Series A debentures; it never paid any interest at all on those of Series B; it paid no dividends on its preferred or common stock. Some of the debenture holders in 1905 became dissatisfied with the failure to receive interest on their bonds, and appointed a protective committee to represent them, at whose instigation and demand the Mercantile Trust Company, as trustee under the debenture mortgage, commenced action against the railroad company on behalf of certain holders of Series B bonds for an accounting and to have certain net earnings which they claimed to exist applied to the payment of the interest on the bonds. The action was begun in the United States Circuit Court, Eastern Division of Eastern District of Missouri, in June, 1905, but never proceeded to judgment. It has been found by the court that the company was advised by its counsel that this litigation was "of a dangerous character, and if permitted to go to interlocutory or final judgment might eventuate in a recovery against the defendant company for many millions of dollars, which would precipitate insolvency on the part of the said company."

Negotiations for an adjustment of the differences with the debenture bondholders' committee were then initiated, and progressed to the point where a proposition was made of the terms upon which the bondholders would exchange their securities for new ones to be issued by the company. On June 11th the board of directors first began to consider the refunding proposition from the debenture holders, as well as an offer for an underwriting thereof, and approved the same. The proposed underwriting never became effective. The agreement proposed was one under date of August 15, 1906, by which the railroad was to issue, in exchange for each $1,000 of debenture mortgage bonds in Series A, $775 in new 4 per cent. 50-year refunding mortgage gold bonds, bearing date July 1, 1906, and payable July 1, 1956, together with $500 par value preferred stock and $560 par value common stock, and for each $1,000 of debenture mortgage bonds, Series B, $700 in such new bonds, $500 par value preferred stock, and $500 par value common stock. This new mortgage was to be one whereon the interest was both cumulative and payable absolutely. Plaintiff bought 1,000 shares of the common stock of the railroad company in the open market on June 13, 1906, after the proposed refunding plan

had been approved and given wide publicity in the public press, and with full knowledge, or complete means of knowing, of the action of the board. On July 29, 1906, the board of directors formally approved the refunding arrangement, and on August 16th called a meeting of the stockholders to ratify it. On September 20, 1906, plaintiff protested in writing to the president of the company against the proposed refunding arrangement.

On October 22, 1906, the stockholders and debenture mortgage holders of the company, at a meeting held in Toledo, Ohio, passed appropriate resolutions authorizing and approving all the steps necessary to be taken to carry into effect the refunding scheme in its final form. This included the execution of the new mortgage to secure an issue of 4 per cent. 50-year refunding mortgage gold bonds to the amount of $200,000,000, to be dated July 1, 1906, secured on all the present and after-acquired property of the company, of which sufficient was to be issued and used to refund, retire, and exchange the existing mortgage bonds, promissory notes, and other obligations of the company, and the balance was to be used for betterments; the increase of the capital stock by the amount of $16,500,000 preferred and $81,-500,000 common stock; and the issue of such amount of the new bonds and preferred and common stock as might be necessary to carry into effect the exchange of the debenture mortgage bonds for the new securities under the terms proposed. The mortgage was executed to the Bowling Green Trust Company, as trustee. That plan, in its form as finally consummated, was as follows: For each $1,000 par value of Series A of the debenture mortgage bonds, the company was to issue $795 par value of the new bonds, $580 par value of the preferred stock, and $580 par value of the common stock; for each $1,000 par value of the Series B, it was to issue $720 par value of the new bonds, $520 par value of preferred stock, and $520 par value of common stock. At this time the market value of $100 in bonds of Series A was $83; of the same amount in Series B, $80.

At the meeting the attorney for the plaintiff read a protest, which was spread upon the record. It set out that the increase in the issue would be "fictitious, without consideration, and void"; that under the Constitution of Missouri capital stock could only be issued for money paid, labor done, or property actually acquired, and that all fictitious increases of stock were void; that the laws of other states where the company was incorporated provided that capital stock could only be issued at par for money or property at its fair value; and that the proposition altered the position of the then stockholders of the company by charging as property a new bond with a fixed cumulative interest, instead of the old nonforeclosable bond, which "places ahead of the present common stock $15,210,000 of preferred stock, upon which dividends of 7 per cent. must be paid before the common stock receives anything, and to the extent of $6,472,500 the proposed issue of preferred stock will be without any consideration, thus diluting that class of stock and depreciating the value of both the preferred and common stock"; that there would also be common stock issued without consideration; and that the debenture stockholders should be disbarred from voting on the proposition which was for their advantage

and the injury of the stockholders. At that meeting 80 per cent. of the stock was represented, as well as 89 per cent. of the debenture bonds. The proposition was adopted; the votes cast by the plaintiff being the only ones recorded in opposition, and the affirmative vote representing 83 per cent. of the combined stock and debenture bonds.

The court has found that, in initiating, authorizing, and consummating the plan of exchange, the board of directors of the company "acted under the advice of competent experts, acted in good faith and with reasonable care and diligence"; that the stockholders acted with full knowledge of every essential feature of the transaction, and after the submission of a list of the debenture bondholders; and that the negotiations resulting in the refunding plan "were considered in good faith and in the mutual interests of the stockholders and debenture mortgage bondholders of said defendant company." At this time the defendants Gould, Pierce, and Jeffery were directors in the company, and "acted and exercised their powers as such in ordering, assisting, participating in, and carrying into effect the said plan and scheme of exchange." At the same time, of the issue of Series A debenture bonds, George Gould owned $110,000; the estate of his father, Jay Gould, $1,322,000; his brother, Edwin Gould, $78,000; the Bowling Green Trust Company, wherein the three defendant directors were also directors, $63,000; and Russell Sage, $1,190,000. Of Series B bonds, George Gould owned $901,000; other members of his family, over $700,000; three other directors of the Wabash Railroad, $124,-000; Russell Sage, $446,000; and the St. Louis & Iron Mountain Railway, whereof George J. Gould was president, and three of his brothers directors, $5,435,000.

On November 26, 1906, plaintiff brought suit in the circuit court for the city of St. Louis, in the state of Missouri, seeking to enjoin the carrying through of the proposed refunding scheme as violative of the Constitution of Missouri, and as creating a fictitious increase of stock and on other grounds. A temporary injunction having been denied, the action was dismissed without prejudice on plaintiff's motion on December 27, 1906, on which day he commenced a new suit in the same court for the same relief, attacking the plan as illegal and unauthorized, violative of the Constitution of Missouri, and without the unanimous consent of the stockholders, thereby rendering the proposed new issue of preferred stock illegal under the laws of Missouri. A restrictive order having been obtained pending an application for a temporary injunction, the latter relief was denied, and the order vacated on December 28, 1906. Thereafter the plan of refunding, the carrying out of which had been suspended to allow plaintiff's application for an injunction to be determined, was consummated by the actual issue and delivery of the new securities. In all, $3,500,000 of the Series A bonds were turned in, and $2,782,500 of the refunding bonds, $2,030,000 of the preferred stock, and $2,030,000 of the common stock were issued in their place, making a total of $6,842,500 of new securities. On the Series B bonds, $25,244,000 were turned in, and for them $18,175,680 of the refunding bonds were issued, with $13,-126,880 of the preferred stock and $13,126,180 of the common stock, in all $44,429,440. Thus, for a total of $28,744,000 par value of deben-

ture bonds, a total of $51,271,940 par value of new securities was issued. The debenture bonds turned in were not canceled, but were held by the mortgagee, the Bowling Green Trust Company (thereafter merged in the defendant Equitable Trust Company), as additional security under the new mortgage; but they could be canceled on the written consent of the railroad company. Besides so much of the new issue of bonds as was used in refunding, some $6,000,000 were exchanged for equipment bonds of different issue, $7,800,000 were used to retire notes, and $7,000,000 were employed for other corporate purposes. The court found that the bonds issued under the refunding scheme could not be identified from those issued for other purposes, and that all the preferred and common stock issued in the process of refunding, except certain shares held by the defendant St. Louis, Iron Mountain & Southern Railway, and other stock in the hands of the Metropolitan Trust Company (which in each case was issued in carrying out the plan to those holders, and not disposed of), was by reason of successive subsequent transfers commingled with the other stock of the same class, and had passed into the hands of bona fide purchasers for value.

On January 23, 1907, plaintiff commenced the present action, which on application of the railroad company was thereafter removed into the United States Circuit Court for the Southern District of New York, which court on January 10th dismissed the complaint as to the Metropolitan Trust Company, and on February 28, 1909, took the same action as to the other defendants. 167 Fed. 145. An appeal from the latter dismissal having been taken to the United States Circuit Court of Appeals, that court reversed the decree and remanded the action to the Supreme Court of this state for determination. 176 Fed. 333, 100 C. C. A. 1. Thereafter the Wabash Railroad Company became financially embarrassed, and on December 18, 1911, in an action brought against it by the Westinghouse Air Brake Company in the United States Circuit Court, Eastern Division, Eastern District of Missouri, on allegations of insolvency, receivers were appointed whose control was by subsequent orders in other jurisdictions extended to all the property of the company in the various states through which its lines passed or where it had property. In that action the railroad company had entered an appearance, filed an answer admitting the allegations of the complaint, and joined in the application for the appointment of receivers. On January 1, 1912, the railroad company defaulted in the payment of interest on the refunding bond issue. Before these happenings, defendant Gould had sold his stock and bonds in the company (save enough shares to qualify him as a director) to the public.

On January 29, 1912, the Equitable Trust Company, as successor to the Bowling Green Trust Company, and as trustee under the mortgage (said two trust companies having duly merged in the former, which succeeded to all the rights, franchises, and interest of the latter), on the demand of holders of at least 25 per cent. in amount of the bonds secured by the refunding mortgage, began an action in the United States District Court, Eastern Division, Eastern District of Missouri, for the foreclosure of said mortgage, on allegations that the interest on the

$40,600,000 of the bond issue secured thereby, amounting to $812,000, and represented by coupons due January 1, 1912, had not been paid. On January 30th, the receivers appointed in that action, and the three receivers theretofore appointed, were also appointed therein. On July 1, 1912, the railroad company again defaulted in the payment of the coupons, amounting to $812,000, representing the interest due on that day, and on July 17, 1912, the Equitable Trust Company filed a supplemental complaint setting forth such second default.

Meantime the defendants in the present action had demurred to the complaint, and on appeal to this court the demurrers of all the defendants save the Mercantile Trust Company were overruled, and it was held that the complaint stated a good cause of action, and that, because the validity of the plan of exchange of the new securities for the debenture bonds was attacked both as ultra vires the corporation and by reason of the personal interest of the directors in it, two causes of action were not stated, but only one. 142 App. Div. 755, 127 N. Y. Supp. 782. Thereafter the defendants answered, and among other things interposed four affirmative defenses: (1) Ratification by a majority of the stockholders; (2) knowledge by plaintiff of the plans when he bought his stock, and that he purchased it for the purpose of bringing suit; (3) plaintiff's failure to orginally base his protest and actions on the present assigned grounds of invalidity; (4) purchasers of new bonds and stocks are necessary parties to the action.

[1, 2] The court at Special Term sustained the demurrers to each of this these defenses in an opinion dealing with each of these propositions, and on appeal to this court the judgment was affirmed on that opinion. 150 App. Div. 709, 135 N. Y. Supp. 785. That opinion, thus made the expression of the views of this court, held that the issue of the preferred stock without the unanimous consent of all the stockholders was void under the provisions of article 12, § 10, of the Constitution of Missouri, providing that "no corporation shall issue preferred stock without the consent of all the stockholders." The court said on that subject:

"Admittedly, preferred stock is planned to be issued without the unanimous consent which the Constitution of Missouri requires, and as the pleadings stand the words of the Constitution, taken as correctly stated in the complaint, are that 'no corporation shall issue preferred stock without the consent of all of the stockholders.' Here appears to be an absolute prohibition of an act which is integral to the plan now attacked, and ratification by a majority of the stockholders could not make that act valid, since the very law itself defines the extent of the ratification required. An illegal corporate act cannot be ratified by a majority of stockholders. Taylor v. Earle, 8 Hun, 1. I find no force in the contention that this explicit provision of the Constitution of Missouri may be limited to an original issue of preferred stock, as distinguished from an issue of increased preferred stock."

The defendants have advanced nothing upon the present appeal which leads to a change in the view then taken of the effect of the constitutional provision in question.

[3] Furthermore, the plan of exchange was invalid and violative of the constitutional and statutory provisions of states subject to whose laws the consolidated corporation was doing business, prohibiting ficti-

tious issue and increase of stock or indebtedness.   The provisions in three of these states are as follows:

Article 12, § 8, of the Constitution of the state of Missouri pro-- vides as follows:

"No corporation shall issue stock or bonds, except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void."

Article 11, § 13, of the Constitution of the state of Illinois, provides as follows:

"No railroad corporation shall issue any stock or bonds, except for money, labor or property actually received, and applied to the purposes for which such corporation was created; and all stock dividends, and other fictitious increase of the capital stock or indebtedness of any such corporation, shall be void."

Section 6344 of the Compiled Laws of the state of Michigan provides as follows:

"That it shall not be lawful for any railroad company existing by virtue of any of the laws of this state, nor for any officer of any such company, to sell, dispose of, or pledge any shares in the capital stock of such company, nor to issue certificates of shares in the capital stock of such company until the shares so sold, disposed of, or pledged, and the shares for which such certificates are to be issued shall have been fully paid, nor issue any stock or bonds except for money, labor or property actually received, and applied to the purpose for which such corporation was created; and all fictitious stock dividends and other fictitious increase of the capital stock or indebtedness of any such corporation shall be void; and if any officer or officers of any such company shall issue, sell, pledge, or dispose of any shares or certificates of shares of the capital stock of such company, in violation of the provisions of this act, such officer or officers so doing shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished as provided by law in case of issuing false or fraudulent railroad stocks.   The provisions of this act shall apply as fully to the stocks and officers of consolidated railroad companies, as existing in whole or in part within this state, as to original unconsolidated companies existing as aforesaid."

The courts of Missouri, at least, have unmistakably interpreted the meaning of the constitutional requirement in that state.   In Garrett v. Kansas City Coal Mining Co., 113 Mo. 330, 20 S. W. 965, 35 Am. St. Rep. 713, the court held an agreement void by which a promoter was to receive for property and services stock of a par value far in excess of the property conveyed and the services rendered, and quoted the language of Lord Justice Gifford in Drummond's Case, 4 Ch. App. 772:

"If a man contracts to take shares, he must pay for them, to use a homely phrase, in meal or in malt; he must either pay in money or in money's worth."

It held that the property or labor must be a fair, just, and needed equivalent for the money subscribed.

In Van Cleve v. Berkey, 143 Mo. 109, 44 S. W. 743, 42 L. R. A. 593, it was said:

"Upon a review of all the cases decided by the appellate courts of this state since the adoption of the Constitution of 1875, the ruling in all of which will be found to be in harmony, it is impossible to escape the conviction that in this state, whatever may be the case in some of the other states, the American trust doctrine, as suggested by Mr. Justice Harlan, has indeed been 'rein-

forced' by its Constitution and statutes, and that the proposition that the stock of a corporation must be paid for 'in meal or in malt' in money or in money's value, is not a mere figure of speech, but really has the significance of its terms. It may be paid for in property, but in such case the property must be the fair equivalent in value to the par value of the stock issued therefor; that it is the duty of the stockholders to see that it possesses such value; that when a corporation is sent forth into the commercial world, accredited by them as possessed of a capital in money, or its equivalent in property, equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid, and that the money or its equivalent in property will be forthcoming to respond to his legitimate demands. In short, it is the duty of the stockholder, and not of the creditor, to see that it is so paid; hence the inquiry in a case between the creditor and a stockholder, when property has been paid in for the capital stock of a corporation, is not whether the stockholder believed or had reason to believe that the property was equal in value to the par value of the capital stock, but whether, in point of fact, it was such equivalent."

And in Rumsey Mfg. Co. v. Kaime, 173 Mo. 551, 73 S. W. 470, the court said:

"It is conceded by counsel for defendant that property taken by a corporation in payment of its capital stock must be a fair and just equivalent in value to the corporation to the par value of the stock issued therefor. Liebke v. Knapp. 79 Mo. 24; Garrett v. Mining Co., 113 Mo. 330 [20 S. W. 965, 35 Am. St. Rep. 713]; Van Cleve v. Berkey, 143 Mo. 109 [44 S. W. 743, 42 L. R. A. 593]. This being conceded to be the law, it follows that as the stock of goods was sold to the corporation by said promoters for $17,000 or $18,000 more than its fair and full market value, then the full-paid, nonassessable stock of the corporation is illegal and fraudulent in law to the extent of its over-valuation."

There can be no pretense that the old debenture bonds were equal in value to the par value of the new securities issued in exchange therefor; the figures heretofore given demonstrate the contrary. The real computations on which the refunding was based were probably those testified to by several witnesses, viz., the new bonds were treated as worth 80, the new preferred stock as worth 40, and the new common stock as worth 20, making an average value for the new securities of 88⅞ as against 83 for the old. But all this was in flat violation of the provisions of law. It was not only an overpayment for the old securities, but was an issue of new securities at far below par. The great advantage gained was by the debenture bondholders, who acquired foreclosable bonds, instead of their nonforeclosable and largely nonproductive debentures. The company only hastened the day of reckoning, by incurring a fixed charge in place of one which it had been unable to meet, but to the failure to meet which no penalty was attached, in view of the discretion given its directors to declare its inability to discharge it.

[4] The court at Special Term has found in this case that:

"The property and pecuniary value of the considerations received by the defendant, the Wabash Railroad Company, for the new securities issued under the plan of exchange, was fairly equivalent to the par value of the securities so issued."

This finding is not warranted by the evidence, which shows conclusively, as found elsewhere by the court, that:

"No consideration was received by the Wabash Railroad Company for the securities issued under the plan of exchange, other than the delivery and deposit of the said debenture mortgage bonds."

There was no consideration to warrant the additional issue of $22,000,000 of the company's securities. Even if the additional preferred stock were not to be regarded as an integral part of the plan of refunding, the debenture bondholders received $1,335 in bonds and common stock for each $1,000 in Series A, and $1,200 for each $1,000 in Series B. The excess in par value of securities exchanged, disregarding the preferred stock, was $335 over par in Series A, and $200 in Series B, and, including the preferred stock, it rose to $835 in the former series, and $700 in the latter. At this time both Series A and B were much below par, as heretofore stated; A being quoted at 83 and B at 80, while common stock was selling at 21. Preferred stock was selling at 43.

While the suggestion is made that under the old mortgage indebtedness the company would still have gone into the hands of receivers, the fact remains that it could not have been thrown into the hands of receivers on the application of the debenture bondholders, whose security was a nonforeclosable mortgage only, and whose interest was payable only if the board of directors determined that funds were available for that purpose. Whatever might have happened, had not the refunding scheme gone through, is pure speculation. What did happen was that, after it had been accomplished, the road ultimately was placed in the hands of receivers on its conceded insolvency at the suit of security holders represented in the new mortgage, whose principal object seems to have been the protection and improvement of the condition of these debenture bondholders. For, while the ostensible purpose of the new refunding mortgage was not only to pay off old obligations, but to raise money for the extension and better equipment of the road, the significant fact remains that no provision had been made for the underwriting of the new issue, and only a comparatively small sum was actually raised from it for the needs of the company. Half of the total amount issued of the new mortgage bonds was used to place these debenture bondholders in a position where they would have a security paying a fixed and cumulative rate of interest, and with the right and power to foreclose the same if that interest was not promptly paid.

The need for issuing the new securities to the holders of equipment bonds and notes does not appear; and that the matter was not handled with such good faith as the defendants claim is indicated by the fact that the surplus of $22,000,000 in the new securities was covered up by a bookkeeping entry in the annual report of the railroad company for the year ending June 30, 1907, by which an increase in the cost of road and equipment was indicated at $22,460,757.81, whereas in fact the only increase actually made in that item for such year was $306,085.53. The difference between these sums is about the difference in the old and new securities issued for the refunding.

The court at Special Term has found that the plan of exchange of the debenture mortgage bonds was illegal, void, and ultra vires. It

would have been justified in holding as well that the plan of exchange was and is illegal, void, and ultra vires, as violative of the provisions quoted from the Constitutions of Missouri and Illinois, and the laws of Michigan, as providing for the fictitious issue of stocks and bonds. But having found the plan of exchange illegal, and that the action being a derivative one, the judgment must be in favor of the defendant the Wabash Railroad Company for an accounting, and that the directors who initiated and carried out the plan in question must account to the company for their official conduct, and pay to the company an amount in reimbursement of the loss sustained by the plaintiff, as set forth in the evidence, and that the equities be adjusted between them, it proceeded to hold that, inasmuch as no other stockholder save plaintiff had endeavored to come in and take advantage of the suit, or objected to the plan of exchange, they must be deemed to have acquiesced therein, and to have no opportunity of reimbursing themselves by means of the accounting, and it was therefore concluded that the plaintiff was entitled to such benefit as an accounting would give him, namely, to be relieved from the operation of the plan and be reimbursed for the actual cost of his stock, together with interest and costs. The individual directors, therefore, who were members of the board of directors which initiated and consummated the plan of exchange, were determined to be liable to account to the defendant railroad company for the damages which plaintiff, as stockholder, had sustained and would be entitled to recover on such accounting, and payment of the sum paid by him for his stock, with interest, directly to him, was to be deemed a sufficient compliance with the direction to account.

[5] For such relief, and for the judgment carried into effect, no justification can be found. This is not an individual action, brought by the plaintiff to recover his own damages; for such an action he could not sustain. His is a representative action, and in such case the rule is laid down in Miller v. Crown Perfumery Co., 125 App. Div. 881, 110 N. Y. Supp. 806, as follows:

"The plaintiff, as a stockholder, sues on behalf of himself and other stockholders. His right of action is representative. He sues on behalf of the company to compel restitution by directors of moneys of the company improperly voted to and received by themselves, and his standing in court depends upon the allegation and the proof of the control by said defendants of the company, and the refusal of the company, by reason of such control, to bring said action in its own behalf. It is the wrong to the company he is seeking to redress; it is the restoration of its funds to its treasury for which he seeks the aid of the court. Under such circumstances a minority stockholder, suing the directors upon their official acts, is not entitled to direct personal relief. When the funds improperly taken from the treasury are restored thereto, they become the property of the corporation. They may be necessary for the payment of its debts. It may be advisable that they be retained in the treasury as working capital. The management of the corporate affairs is intrusted to its officers and directors."

See, also, Kavanaugh v. Commonwealth Trust Co., 181 N. Y. 121, 73 N. E. 562; Continental Securities Co. v. Belmont, 206 N. Y. 7, 99 N. E. 138, 51 L. R. A. (N. S.) 112, Ann. Cas. 1914A, 777; Drucklieb v. Harris, 84 Misc. Rep. 291, 147 N. Y. Supp. 298; Godley v. Crandall & Godley Co., 212 N. Y. 121, 105 N. E. 818.

Having reached the conclusion that the plan of exchange was illegal and void, and that the individual directors had actively participated therein, the only proper judgment was that they should account to the railroad company for the damages which it had sustained by reason of their illegal acts. The rule governing their liability is that laid down in Holmes v. Willard, 125 N. Y. 75, 25 N. E. 1083, 11 L. R. A. 170, as follows:

"When the directors and officers of a corporation engage in ultra vires transactions, and thus cause damage to the corporation, they may be jointly and severally liable for such damage; and when sued for such damage, a subordinate officer cannot establish an absolute defense by showing that his transactions were assented to or even directed by the directors. Austin v. Daniels, 4 Denio, 299; Hun v. Cary, 82 N. Y. 65, 37 Am. Rep. 546. Directors and officers of corporations are agents of the corporation for which they act, and for their unauthorized transactions they may be liable to their principal, just as the agent of an individual may be liable for the damage caused to his principal by his unauthorized acts."

[6] What damage has the plaintiff established which the corporation has sustained by reason of the acts of directors? The actual money damage proven was the payment of interest coupons on the refunding mortgage bonds issued in exchange for the debenture bonds in Series A and B, as shown by Plaintiff's Exhibit 23—A, which was proven by the witness Otteson to have been actually made in the amounts appearing below (the interest computed thereon is up to October 15, 1913, a few days before the trial of this action):

"$20,958,000 Wabash Railroad Company first and refunding extension mortgage 4 per cent. bonds issued in exchange for debenture bonds, viz.: $3,500,000 of Series A. $25,244,000 of Series B. Statement showing amount of coupons which have matured thereon, with interest to October 15, 1913:

| Coupons Due. | Amount. | Interest on Coupons at 6 per cent. to October 15, 1913. | | |
|---|---|---|---|---|
| Jan. 1, 1907, | $370,839 | 6 yrs. | 9½ mos. | $151,116.89 |
| July 1, 1907, | 383,501 | 6 " | 3½ " | 144,771.61 |
| Jan. 1, 1908, | 392,385 | 5 " | 9½ " | 136,353.78 |
| July 1, 1908, | 397,857 | 5 " | 3½ " | 126,319.60 |
| Jan. 1, 1909, | 407,157 | 4 " | 9½ " | 117,057.63 |
| July 1, 1909, | 417,536 | 4 " | 3½ " | 107,515.52 |
| Jan. 1, 1910, | 418,720 | 3 " | 9½ " | 95,258.80 |
| July 1, 1910, | 418,861 | 3 " | 3½ " | 82,725.04 |
| Jan. 1, 1911, | 418,875 | 2 " | 9½ " | 70,161.56 |
| July 1, 1911, | 419,163 | 2 " | 3½ " | 57,634.91 |

$4,044,894
1,088,915.34

$5,133,809.34

$1,088,915.34

Apart from this, no actual damage to the company has been proven, for the refunding mortgage bonds issued in place of Series A and B of the debenture bonds, while included in the entire amount issued and covered by the mortgage to foreclose which action has been begun, being invalid and illegally issued, are subject to that defense by the company, and there is nothing in the record to indicate that the company would not protect its rights and those of its stockholders by interposing a defense of the invalidity of one-half of the securities covered by

the mortgage sought to be foreclosed. Nor does the alleged fact, which the court has found at defendant's request, that these bonds issued in refund for the debentures cannot now be identified by number or otherwise (save as to those owned by the St. Louis, Iron Mountain & Southern Railway Company, and held by the Metropolitan Trust Company, as pledgee), create any liability on the part of the directors; for apart from the failure of the evidence to justify such a broad finding (it appearing that, both as to bonds and stock so issued, the identification of the refunding securities is a matter of labor and difficulty, rather than of impossibility) the directors are not shown to have known, contemplated, or created this condition of mingling or confusion or inability to segregate the bonds according to the use they were put to, nor to have had reason to believe it might exist.

It would seem as if any orderly conduct of the company's business would leave it in a position to ascertain which of its now outstanding securities represent the succession to securities originally issued in refund for debenture bonds, and it will doubtless so find when the necessity arises. If it cannot, the condition is not one for which the directors can be held liable. In any event, up to the date of the trial no actual damage has been caused to the company by the quota of new securities issued for refunding debenture bonds, save the interest payments referred to. It is not necessarily a mere issue of obligations or evidence of indebtedness that creates a liability for which directors have to answer to the corporation; it is an actual payment or loss occasioned thereupon or thereby. The actual damage established to have been caused to the company by the directors is the sum of $5,133,809.-34, with interest on that sum since October 15, 1913, and to that amount their liability must be confined. In view of the fact that such sum is fixed and unchangeable, and is not questioned by either side, as the amount of the interest coupons paid, with the interest thereon, the direction to account should be followed by the provision that as, upon such accounting, the amount shown to be due from the three directors to the company would be $5,133,809.34, with interest thereon from October 15, 1913, they be directed to pay the same forthwith into the treasury of the company.

As cross-appeals have been taken herein, we are called upon to act on such of the exceptions to the decision filed by plaintiff as we deem material to dispose of. The following finding of fact, made at the request of defendants, is set aside as against the evidence:

B–50: "That the property and pecuniary value of the considerations received by the defendant the Wabash Railroad Company for the new securities issued under the plan of exchange was fairly equivalent to the par value of the securities so issued."

Also the further conclusions of law, made at the request of the defendants, are set aside as unwarranted: B–6, B–7, and B–9. Also the following conclusions of law made by the court of its own motion: In C–2, all of the first sentence after the words "effect of its operation," and all of the second sentence thereof; C–3 and C–5.

There should be a new finding, which may be numbered A–42, seting forth the provisions of article 12, § 8, of the Constitution of the

state of Missouri, article 11, § 13, of the Constitution of the state of Illinois, and section 6344 of the Compiled Laws of the state of Michigan.

There should be a new conclusion of law, following that marked A–2, finding that:

"The plan of exchange of the debenture mortgage bonds of the Wabash Railroad Company described in the complaint herein was and is illegal, void, and ultra vires, as in violation of article 12, § 8, of the Constitution of the state of Missouri, article 11, § 13, of the Constitution of the state of Illinois, and section 6344 of the Compiled Laws of the state of Michigan, as providing for a fictitious increase of the stock indebtedness of such company."

The judgment is modified, by striking out the direction that the defendant directors Jeffery, Pierce, and Gould account to the defendant the Wabash Railroad Company for such damage as "the plaintiff as a stockholder has sustained," and the further determination "which damage is equal to the sum which he would be entitled to receive on such an accounting, and is fixed at $21,000, with interest from the 13th day of June, 1906, payment of such sum of $21,000, with interest from the 13th day of June, 1906, directly to the plaintiff, to be deemed a sufficient compliance with such direction to account," and by substituting therefor the direction that judgment—

"be entered adjudging that the defendants Edward T. Jeffery, Winslow S. Pierce, and George J. Gould, being the defendants served herein who were members of the board of directors which initiated and consummated the plan of exchange referred to in the complaint, account to the defendant the Wabash Railroad Company for such damage as it has sustained by reason of their acts in the premises; and it appearing that upon such an accounting the amount of such damage would be the sum of $4,044,894, the aggregate of the sums paid as interest on the bonds issued to refund the debenture bonds under the illegal plan in question, with interest thereon, which up to October 15, 1913, for the respective date of payment, amounted to $1,188,915.34, making in all the sum of $5,133,809.34, with further interest on said sum from said date, it is hereby adjudged and decreed that, in lieu of further accounting, the defendants Jeffery, Pierce, and Gould shall pay unto defendant the Wabash Railroad Company the sum of $5,133,809.34, with interest thereon from October 15, 1913, to the date of said payment."

The remaining parts of the judgment, beginning with the words "permanently enjoining the defendants," are affirmed. As thus modified, the judgment is affirmed, with costs to the plaintiff against the defendants Wabash Railroad, Jeffery, Pierce, Gould, Krech, and Goelet, and with costs to the Equitable Trust Company against the plaintiff. Settle order on notice. All concur.