MONARCH CEMENT COMPANY,
Plaintiff–Appellee,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 78–2026.

United States Court of Appeals,
Tenth Circuit.

Argued May 9, 1980.

Decided Oct. 27, 1980.

Robert T. Duffy, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Jonathan S. Cohen, Attys., Tax Division, Dept. of Justice, Washington, D. C., with him on the brief), (James P. Buchele, U. S. Atty., and Jon K. Sargent, Asst. U. S. Atty., Wichita, Kan., of counsel), for defendant–appellant.

Richard Jones, Wichita, Kan. (Greer Gsell, Wichita, Kan., with him on the brief), of Hershberger, Patterson, Jones & Roth, Wichita, Kan., for plaintiff–appellee.

Before McKAY and BREITENSTEIN, Circuit Judges, and MARKEY, Chief Judge.*

McKAY, Circuit Judge.

The district court found that certain warrants (options) issued as part of a 1956 loan transaction were equivalent, for federal income taxation purposes, to an additional interest charge of 1½ percent per annum. *Monarch Cement Co. v. United States*, 458 F.Supp. 384, 387 (D.Kan.1978). The finding translates into an effective value for the warrants of $643,957.14. If that valuation stands, taxpayer Monarch Cement Company is entitled to an income tax refund under I.R.C. § 163(a)[1] of $373,931.81 for the tax

---

* Of the United States Court of Customs and Patent Appeals, sitting by designation.

1. Section 163(a) provides, as the applicable general rule, that "[t]here should be allowed as

years 1968–71. On appeal, the government argues that Monarch has been made overly secure in its effects because these warrants issued with no such probable cost.[2]

In the mid–1950's, Monarch sought funding for a massive plant renovation and expansion project. After an unsuccessful attempt to place a debt and preferred stock combination,[3] Monarch marketed an "investment unit," see Treas.Reg. §§ 1.163–3(a)(2), 1.1232–3(b)(2)(ii)(a), consisting of a fifteen–year note for $6,250,000, at 4½ percent interest per annum, and an "equity kicker"–warrants (options) granting the lender the future right to acquire ten percent of Monarch's stock (48,000 shares) at $17.50 per share.

The warrants represent the "discount" at which the note was issued. Under regulations promulgated in 1968, such discounts may ordinarily be amortized and deducted over the life of the obligation. See Treas. Reg. § 1.163–3(a)(1). For investment units issued between December 31, 1954, and December 24, 1968, and having an obligation still outstanding on that latter date,[4] the entire discount may be deducted over the remaining life of the obligation. Treas. Reg. § 1.163–3(a)(2). Hence, the discount on the Monarch note provides a potentially significant tax benefit to the company for the tax years 1968–71. In order to determine the amount of the amortizable discount, the district court had to calculate the value of the warrants at the time of the loan transaction.

Treasury regulations direct that when, as here, the fair market value of the warrants is "not readily ascertainable," the value is to be determined by reference to the probable interest rate at which the note could have been issued without the warrants. Treas.Reg. § 1.1232–3(b)(2)(ii). The district court concluded that the lender would have required a six percent interest rate if the note had been issued without the warrants. This conclusion is supported by substantial evidence in the record and was arrived at in light of conflicting testimonial and documentary evidence. Under such circumstances, the district court's factual finding can be overturned only if clearly erroneous. Fed.R.Civ.P. 52(a).

■ No clear error is present in this case. Two experts, one in live testimony and the other in a deposition admitted into evidence, testified that a six percent interest rate would have been required to obtain the loan without the warrants. These opinions were reached in light of the conditions and circumstances of the loan, including average return rates, the limited market for Monarch stock, the nature of Monarch's business and the high debt–equity ratio resulting from the loan–Monarch was attempting to borrow an amount near or in excess of its own net worth.

The government claims that the district court's error is demonstrated by the practical result of its findings. Based upon the six percent interest rate found by the court, a stipulated mathematical formula produced a value for the warrants of $643,957.14, or $13.40 per warrant. The court also found that Monarch's stock was trading at approximately $11.00 per share at the time of the loan. The result of these findings by the trial court is that the lender, in effect, paid $13.40 per share for the future right to pay $17.50 for stock trading at the time at $11.00 per share.

Despite the apparent inconsistency, we believe the court's finding as to the value of the warrants is amply supported by the record. The disparity between the total price the lender might ultimately pay for

---

a deduction all interest paid or accrued within the taxable year on indebtedness."

2. At one time the government contended that the warrants had no value. On appeal, the government now argues only that the value of the warrants was considerably less than that found by the district judge.

3. The package consisted of $4,500,000 in 15–year, 4¼ to 4½ percent debentures and $1,500,000 in 5¼ to 5½ percent preferred stock.

4. The Treasury Secretary's limitation of the deduction "to those who had not fully closed their bond and debenture account" as of December 24, 1968, was upheld in Danly Mach. Corp. v. United States, 492 F.2d 30, 33 (7th Cir. 1974).

the stock and the price at which the stock was then trading might be explained by a number of factors. The evidence showed that very few shares of Monarch stock were trading at the time. The general unavailability of the stock could make warrants representing the future right to purchase ten percent of the company worth more than the per share amount at which the very few traded stocks were being sold at the time. Favorable expectations, especially in light of the perceived additional value that would be generated by the substantial loan being contemplated,[5] could have led the lender to believe that warrants to purchase a substantial block of otherwise unavailable stock were worth $13.40 per share.

The government also points to the fact that the lender purportedly paid $643,957.14 for the warrants in 1956 when Monarch stock was trading at $11.00 per share, only to sell the same warrants back to Monarch six years later for only $650,000, at a time when Monarch stock was trading at approximately $26 per share. In determining the 1956 value of the warrants, however, the 1962 redemption price is not controlling, nor even necessarily important. The 1956 value of the warrants would be based partly upon the perceived future value of the underlying stock. The fact that the warrants were later sold for little profit might reflect nothing more than frustrated expectations.

In any event, we are not called upon to decide what value we might assign the warrants. Our function ends upon a determination that the value found by the district court is not clearly erroneous.

The government also points to alleged legal error in the method used by the district court to determine the value of the warrants. Treasury regulations require that, if the fair market value of the warrants is not readily ascertainable, the district court shall determine the interest rate at which the note would have been market-

ed without the warrants. This "assumed price" is to be determined "by comparison to the yields at which obligations of a similar character which are not issued as part of an investment unit are sold in arm's length transactions." Treas.Reg. § 1.1232–3(b)(2)(ii)(a). The regulation further provides:

> Any reasonable method may be used in selecting an obligation for comparative purposes. Obligations of the same grade and classification shall be used to the extent possible, and proper regard shall be given, with respect to both the obligation in question and the comparative obligation, to the solvency of the issuer, the nature of the issuer's trade or business, the presence and nature of security for the obligation, the geographic area in which the loan is made, and all other factors relevant to the circumstances.

*Id.*

■ The government claims that the district court applied this regulation incorrectly by failing to analyze comparable obligations. Although the regulation provides that comparable obligations be analyzed in the valuation process, it does not eliminate the court's discretion to employ other reasonable methods in evaluating the warrants—especially if little or no evidence of any directly comparable obligations is available. In this case, there was testimony that Monarch is "basically a very unique company" and that "[g]ood comparative vehicles or good data is simply not available." Record, vol. 3, at 88.

Furthermore, the regulation does not provide that the interest rate of a comparable obligation is conclusive. Rather, it provides for the comparison of other obligations, but at the same time provides that "proper regard" be given to "all other factors relevant to the circumstances." Treas.Reg. § 1.-1232–3(b)(2)(ii)(a). Thus, comparable obligations are to be used as a starting point in the valuation process, not an ending point.

---

5. The evidence showed that in 1956 the cement industry faced favorable prospects for expansion. The industry was operating at or near capacity, and the federal government was pre-

paring to begin construction of a massive interstate highway system. Thus, it was anticipated that the demand for cement would increase dramatically.

In this case, neither party presented satisfactory evidence of closely analogous companies or obligations. Monarch's witness arrived at his conclusions by determining the average yield of a variety of other loans and by analyzing the specific factual circumstances surrounding the Monarch loan. The government's witness testified to the interest rates charged during the relevant period for bonds listed in published financial services. Although he considered the factual circumstances surrounding the loan in choosing a comparable bond rating, no attempt was made to show that the borrowing companies or the obligations were comparable in any specific ways to Monarch or its loan transaction.

While the record ideally could have provided us with a more detailed account of the analytical process employed below, we conclude that under the circumstances the district court acted within the evidence and its discretion in evaluating the warrants.

AFFIRMED.