## In re BRIDGE INFORMATION SYSTEMS, INC., Debtor.

**Scott P. Peltz, Plan Administrator, Plaintiff,**

v.

**Welsh, Carson, Anderson & Stowe VII, L.P., Defendant.**

**Scott P. Peltz, Plan Administrator, Plaintiff,**

v.

**Welsh, Carson, Anderson & Stowe VI, L.P., Defendant.**

**Bankruptcy No. 01–41593–293.**

**Adversary Nos. 03–4099–293, 03–4102–293.**

United States Bankruptcy Court, E.D. Missouri, Eastern Division.

July 6, 2004.

Gregory D. Willard, Jennifer A. Merlo, Bryan Cave, St. Louis, MO, Thomas J. Moloney, New York City, for debtor.

Peter Lumaghi, Office of U.S. Trustee, St. Louis, MO, U.S. Trustee.

David B. Goroff, Mark L. Prager, Foley & Lardner, Michael J. Small, Peter E. Pinnow, Chicago, IL, Michael A. Becker, Spencer, Fane, Britt & Browne, Clayton, MO, for Unsecured Creditors Committee.

Bruce W. Doughty, David B. Goroff, Derek L. Wright, Eric M. Wiechert, Geoffrey S. Goodman, Foley & Lardner, Chicago, IL, for plaintiffs.

Benjamin S. Kaminetzky, Christopher L. Garcia, Thomas A. Tormey, Davis, Polk and Wardwell, New York City, David L. Going, Steven N. Cousins, Susan K. Olsen, Armstrong Teasdale, LLP, St. Louis, MO, for defendants.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

These two adversary cases are before the Court on the motions of Welsh, Carson, Anderson & Stowe VI and VII (collectively "Welsh Carson") for partial summary judgment on their subsequent new value affirmative defenses to Plan Administrator's preference claim. The undisputed evidence in the summary judgment record demonstrates that there are no material facts in dispute that Welsh Carson provided Bridge with $30,000,000 in new value on an unsecured basis subsequent to Bridge making the allegedly preferential transfers. There are also no material facts in dispute that Bridge made an otherwise unavoidable transfer to Welsh Carson in exchange for the

$30,000,000 in new value. There are, however, material facts in dispute as to the value of the transfer Bridge made to Welsh Carson on account of the $30,000,000 in new value. Accordingly, the Court will deny Welsh Carson's motions for partial summary judgment.

## JURISDICTION AND VENUE

This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), which the Court may hear and determine. Venue is proper in this District under 28 U.S.C. § 1409(a).

## FACTUAL AND PROCEDURAL BACK-GROUND

Plan Administrator for Reorganized Debtor, Bridge Information Systems, Inc. ("Bridge"), brought these two adversary complaints seeking to avoid as preferential transfers under § 547(b) certain payments that Bridge remitted to Welsh Carson.[1] Two payments totaling $20,641,912 that Bridge made to Welsh Carson in February, 2000 (the "Alleged Preference Payments") are at issue in Welsh Carson's instant motions for partial summary judgement.

The relevant facts concerning the motions are undisputed. Welsh, Carson, Anderson, Stowe, L.P. formed Welsh Carson VI and Welsh Carson VII, along with other entities, for the purpose of purchasing a portion of the equity interest of Bridge. At the time Bridge made the Alleged Preference Payments, the Welsh Carson entities owned approximately 38% of the outstanding voting shares of Bridge.

Bridge made the Alleged Preference Payments to Welsh Carson as part of Bridge's repayment of a $100,000,000 loan agreement with various creditors (the "Loan Agreement"). The Loan Agreement required Bridge to repay each creditor its *pro rata* portion of unpaid principal and interest if Bridge or one of its subsidiaries made a public or private offering of debt or equity. Bridge sold a portion of the equity interest of Savvis Communication Corporation, one of its subsidiaries, in an initial public offering on February 18, 2000. Bridge then transferred the remaining portion of Savvis' equity to Welsh Carson on February 28. Accordingly, Bridge was obligated to repay its creditors under the Loan Agreement and made the Alleged Preference Payments to Welsh Carson on February 18 and February 28 pursuant to that obligation.

Welsh Carson VI and VII wired Bridge $5,000,000 and $25,000,000 respectively on April 13, 2000. Bridge executed promissory notes in favor of Welsh Carson VI and VII (collectively the "April Notes") in exchange for the $30,000,000 in cash. The April Notes carried a rate of interest of 12% *per annum* and were due on December 31, 2005. Also, Bridge's obligations to Welsh Carson under the April Notes were unsecured and subordinated to Bridge's obligations to its other unsecured creditors. It appears that at the time Welsh Carson received the April Notes, it expected that it would exchange the April Notes for preferred shares of Bridge. (Pro Forma of Welsh Carson's holdings in Bridge, Plan Administrator's Memorandum in Opposition Exhibit 13).

On June 30, 2000 Welsh Carson did in fact exchange the April Notes for promissory notes that it could convert into

1. Pursuant to Debtors' Joint Plan of Liquidation, confirmed by this Court on February 13, 2002, Plan Administrator has the exclusive authority to prosecute all claims under § 547 on behalf of the various Debtors' estates.

Bridge's common shares as part of a larger financing transaction between the Welsh Carson entities and Bridge. (the "June Convertible Notes").[2] The June Convertible Notes had an interest rate of 8% *per annum* and were due on December 31, 2005. Like the April Notes, Bridge's obligation to Welsh Carson was unsecured and subordinated. The June Convertible Notes, however, gave Welsh Carson the option to convert the debt into Bridge's common stock at any time prior to December 31, 2005.

The June Convertible Notes also provided a formula for the rate at which Welsh Carson could exchange the debt for Bridge's common stock (the "Conversion Price"). The Conversion Price was a function of the following variables: (1) Bridge's earnings net of interest, taxes, depreciation and amortization ("EBITDA") for the nine months prior to March 31, 2001; (2) Bridge's net outstanding debt on March 31, 2001; (3) the value of Savvis' shares held by Bridge on March 31, 2001 and; (4) the number of Bridge common shares outstanding at the time of conversion (the "Conversion Formula"). The June Convertible Notes provided, however, that the Conversion Price would be no less than $7.00 of debt per share but no more than $17.00 of debt per share.

Bridge filed its petition for relief under Chapter 11 of the United States Bankruptcy Code on February 15, 2001. Plan Administrator filed these adversary complaints on February 7, 2003, seeking to avoid the Alleged Preference Payment under § 547(b). Plan Administrator is also attempting to recover the Alleged Preference Payments from Welsh Carson under § 550(a)(1).

Welsh Carson responded by asserting that even if the Alleged Preference Pay-

ments were preferential under § 547(b), Plan Administrator still cannot avoid the payments because the $30,000,000 in cash it provided to Bridge in April 2000 constitutes subsequent new value under § 547(c)(4).

Welsh Carson filed these two motions for partial summary judgment arguing that there are no material facts in dispute on its subsequent new value defense. For the reasons set forth below, the Court will deny Welsh Carson's motions for partial summary judgment.

## DISCUSSION

### A. Introduction

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Freyermuth v. Credit Bureau Serv., Inc.*, 248 F.3d 767, 770 (8th Cir.2001); Fed. R.Civ.P. 56(c).

If the movant fails to establish that it is entitled to judgment as a matter of law under Fed.R.Civ.P. 56(c) but does establish that there are no genuine issues of fact as to some of the issues in the case, Fed. R.Civ.P. 56(d) allows the Court to enter an order establishing what issues are without substantial controversy. *Kansas Nat'l Bank & Trust v. Kroh (In re Kroh)*, 88 B.R. 972, 975 (Bankr.W.D.Mo.1988); Fed. R.Civ.P. 56(d). The issues the court identifies as without substantial controversy under Rule 56(d) shall be deemed conclusively established for purposes of subsequent litigation. *Lind v. United Parcel Serv.*, 254 F.3d 1281, 1284 n. 4 (11th Cir. 2001).

---

**2.** Welsh Carson cancelled the April Notes as part of the larger financing transaction.

(Plan Administrator's Response, Exhibits 13 and 14).

*B. The Elements of Welsh Carson's Subsequent New Value Defense*

■ Section 547(c)(4) states in relevant part that a trustee or debtor-in-possession may not avoid a transfer that is preferential under § 547(b) if the creditor, after receiving the preference, provided new value to the debtor that was: "(A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to... such creditor." Because § 547(c)(4) is an affirmative defense to a preference action, the creditor has the burden of establishing the statutory elements by a preponderance of the evidence. *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp. (In re Jones Truck Lines, Inc.)*, 83 F.3d 253, 259 (8th Cir.1996); § 547(g).

Here, Plan Administrator does not dispute that Welsh Carson provided the $30,000,000 to Bridge on an unsecured basis after Welsh Carson received the Alleged Preference Payments as required by § 547(c)(4)(A). Also, it is undisputed that Plan Administrator may not avoid whatever rights Bridge transferred to Welsh Carson in the June Convertible Notes for purposes of § 547(c)(4)(B).

Plan Administrator, however, does raise two issue in his opposition to Welsh Carson's motions for partial summary judgment. First, Plan Administrator contends that the $30,000,000 transfer from Welsh Carson to Bridge does not constitute "new value" as defined under the Code. Second, Plan Administrator argues that even assuming the $30,000,000 in cash represents new value, Bridge made a transfer to Welsh Carson on account of the $30,000,000 under § 547(c)(4)(B) when it executed the June Convertible Notes in favor of Welsh Carson.

*C. There is no genuine issue of fact that Welsh Carson's $30,000,000 cash transfer to Bridge constitutes new value.*

■ Section 547(a)(2) defines new value in relevant part as "money or money's worth in goods, services, or new credit." Plan Administrator takes the position that because the parties never intended the $30,000,000 transfer from Welsh Carson to Bridge to be a loan but rather a purchase of equity rights in Bridge, the $30,000,000 cash transfer was not new value. The statute, however, defines new value as money or money's worth in goods services, or new credit. (Emphasis Added). Thus, when a creditor makes an outright transfer of cash to the debtor, that transfer constitutes new value under § 547(a)(2) regardless of what the creditor receives in exchange for the cash payments. *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339, 393 (Bankr.D.Minn.1985) *aff'd.* 850 F.2d 1275 (8th Cir.1988).

Here, it is undisputed that Welsh Carson transferred the $30,000,000 in cash to Bridge after Bridge made the Alleged Preference Payments. Accordingly, there is no genuine issue of fact that Welsh Carson provided $30,000,000 of new value to Bridge on an unsecured basis subsequent to receiving the Alleged Preference Payments for purposes of § 547(c)(4).

*D. Only the Call Option contained in the June Convertible Notes constitute a transfer to Welsh Carson on account of the new value under 11 U.S.C. § 547(c)(4)(B).*

*1. The June Convertible Notes were hybrid financial instruments.*

■ Before analyzing whether Bridge made a transfer to Welsh Carson under § 547(c)(4)(B) when it executed the June Convertible Notes, the Court must first determine the exact nature of the rights Bridge gave to Welsh Carson in executing

the June Convertible Notes. First, Bridge promised to repay the $ 30,000,000 to Welsh Carson at 8% *per annum* by December 31, 2005 on a subordinated and unsecured basis. The execution of an unsecured promissory note is not a payment or transfer under 11 U.S.C. § 547(c)(4) because it simply evidences the debtor's naked promise to make payments in the future. *See Langenkamp v. Hackler (In re Republic Trust & Sav. Co.)*, 897 F.2d 1041, 1043–44 (10th Cir.) *rev'd. on other grounds sub nom. Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). Thus, Bridge's unsecured obligation to repay the $30,000,000 at 8% *per annum* as evidenced in the June Convertible Notes was not a "transfer" to Welsh Carson for purposes of § 547(c)(4)(B). *See Cadillac Ins. Co. v. Am. Nat. Bank*, 1995 WL 489541, *17 (N.D.Ill.1995); *Boyd v. The Water Doctor (In re Check Reporting Serv., Inc.)*, 140 B.R. 425, 430–31 (Bankr.W.D.Mich.1992).

Bridge, however, also gave Welsh Carson in the June Convertible Notes the right to exchange the debt for Bridge's common stock at a rate specified in the Conversion Formula. This right is functionally equivalent to a call option on Bridge's common stock with a strike price equal to the outcome of the Conversion Formula (the "Call Option"). The viability of Welsh Carson's subsequent new value defense, therefore, depends upon whether Bridge make a transfer to Welsh Carson for purposes of § 547(c)(4)(B) by granting Welsh Carson the Call Option.[3]

*2. The locus of ownership of Bridge's common stock underlying the Call Options is not relevant to the analysis under § 547(c)(4)(B).*

■ Welsh Carson initially argues that because the common stock underlying the Call Option was not technically an asset of Bridge when Bridge executed the June Convertible Notes, Bridge did not make a transfer to it under § 547(c)(4)(B). It is true that a corporation's common stock is not technically an asset of the corporation. *Hansen v. Finn (In re Curry & Sorensen, Inc.)*, 57 B.R. 824, 829 (9th Cir. BAP 1986). Rather, a corporation's common stock represents a claim on the corporation's assets and the right to share in its profits. *Strougo v. Bassini*, 282 F.3d 162, 175 n. 10 (2d Cir.2000).

■ In the preference context, however, because distributive equality among the debtor's creditors is the prime policy objective underlying § 547, the relevant inquiry under the subsequent new value defense must focus on whether the transactions in question have in some way negatively impacted the debtor's financial condition. *Kroh Bros. Dev. Co. v. Continental Const. Eng'r, Inc. (In re Kroh Bros.)*, 930 F.2d 648, 654 (8th Cir.1991); *Jones Truck Lines*, 83 F.3d at 258. Thus, in some cases, the locus of ownership of the asset transferred to the creditor in exchange for the new value is not relevant to the analysis under § 547(c)(4)(B).

■ For example in *Kroh Bros.*, a third-party secured creditor made a payment to the creditor on behalf of the debtor. *Kroh Bros.*, 930 F.2d at 652–53. The creditor

---

**3.** Options are considered derivative financial instruments because their value is derivative of the value of the underlying common stock. The June Convertible Notes contained a derivative position along with an unsecured debt obligation. Such a hybrid financial instrument that contains both an unsecured debt obligation along with a derivative position is an embedded derivative. *See generally* John J. Ensminger, *Concerto For Pianos vs. Orchestra: Can Tax & Financial Accounting Harmonize on Hedges*, 16 AKR. TAX. J. 23, 36–39 (2001).

argued that because a third-party made the payment to it, the debtor did not make a transfer to it for purposes of § 547(c)(4)(B). *Id.* The Eighth Circuit disagreed and held that because the relevant analysis is whether the payment negatively affected the debtor's financial condition, if the payment in question increased the third-party's secured claim against the debtor-in-possession, the debtor-in-possession may utilize the third-party's payment to the creditor to negate the creditor's subsequent new value defense. *Id.* at 654. Thus, the question of whether or not the common stock underlying the Call Option was technically an asset of Bridge is not the end of the analysis of whether Bridge made a transfer to Welsh Carson in exchange for the $30,000,000 in new value under § 547(c)(4)(B).

*3. The grant of the Call Option did have a negative effect on Bridge's financial condition.*

■ Welsh Carson next argues that Bridge's execution of the June Convertible Notes cannot be a transfer to it under § 547(c)(4)(B) because the transfer of the Call Option had no financial impact on Bridge. Welsh Carson predicates this argument on a theory that Bridge did not incur a cost when it granted Welsh Carson the Call Option. The Court disagrees with Welsh Carson's contention.

This is an admittedly close question. Normally if the debtor is the entity making the transfer to the creditor on account of the new value, there is no question that the transfer negatively impacted the debtor's financial condition and negates the creditor's new value defense. *See Kroh Bros.,* 930 F.2d at 653. The case of a debtor granting a creditor a call option to purchase its common stock, however, presents an unique problem. The problem arises from the fact that although the re-

cipient of the option clearly receives something of value, it is less clear that the grantor suffers direct financial harm in granting the option. *See Divine v. Comm'r of Internal Revenue,* 500 F.2d 1041, 1052 (2d Cir.1974).

There is some support for Welsh Carson's theory that the grant of a call option has no immediate financial impact upon the grantor corporation. It is true that a corporation's grant of call options on its common stock is not a direct out of pocket expense to the corporation. *See* Kenneth Blackborn, Note, *An Arm's Length Struggle: To Include or Not to Include Stock Options in Cost Sharing Arrangements & Non–Integral Service Agreements,* 91 KEN. L.J. 425, 449–50 (2002–03). The current Generally Accepted Accounting Principles ("GAAP") reflects this approach and does not generally require companies to report the market value of the options it grants its employees as an expense on its income statement until the employee exercises the option. Accounting Principles Board No. 25 (1972) ("APB No. 25").

The Secretary of the Department of Health & Human Services has followed APB No. 25 and has promulgated a regulation that states the value of stock options a health care provider grants its employees is not an actual cost for reimbursement purposes under 42 U.S.C. §§ 1395f(b) & 1395x(v)(1)(A). 42 C.F.R. § 413.5(c)(7). Courts have held that the secretary's reliance on APB No. 25 in excluding the value of stock options from the corporation's actual cost is a reasonable interpretation of what is an actual cost under 28 U.S.C. §§ 1395f(b) & 1395x(v)(1)(A). *See e.g. Dominguez Valley Hospital v. Shalala,* 57 F.3d 832, 836 (9th Cir.1995).

■ The Court believes, however, that the approach embodied in APB No. 25 does not reflect the economic realities underlying such transactions and is inconsis-

tent with the policy objective underlying § 547. Because distributive equity is the primary policy objective underlying the preference statute, a debtor makes a transfer for purposes of § 547 if the transfer will deprive the debtor of something of value which it could have otherwise used to benefit its other unsecured creditors. *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1352 (7th Cir.1996) *cert. denied* 519 U.S. 1111, 117 S.Ct. 948, 136 L.Ed.2d 837 (1997).

Here, Bridge's transfer of the Call Option to Welsh Carson did deprive Bridge of something of value. Although a corporation's unissued common stock may not technically be an asset of the corporation, the sale of the common stock is a means by which the corporation may raise capital. Therefore, a corporation's unissued common stock is of "very great actual value" to the corporation.[4] *Pollitz v. Wabash R.R. Co.*, 207 N.Y. 113, 100 N.E. 721, 725 (1912). Likewise, because an option is simply a right to purchase the grantor corporation's stock at a specified price and the corporation has the ability to sell that right, an option also has value to the grantor corporation. *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 59 (Del.1952); *Frankel v. Donovan*, 120 A.2d 311, 314–15 (Del.Ch.1956). (Holding that a court of equity may order the rescission of the grant of an option to purchase the shares of a corporation's common stock if the corporation failed to receive adequate consideration in exchange for it).

Because a company may sell call options on its common stock, granting those options certainly represents an opportunity cost to the corporation. This opportunity cost is equal to the price the corporation could have obtained for the option from a third-party. Thus, as one commentator observed, when a corporation grants an option to purchase its underlying stock, it has the same financial impact on the firm as giving the grantee cash in an amount equal to the market price of the option.[5] Anthony J. Luppino, *Stopping the Enron End–Runs & Other Trick Plays: The Book–Tax Accounting Conformity Defense*, 2003 COL. BUS. L. REV. 35, 88–89 (2003).

Because the Call Option did have value, Bridge could have conceivably sold it to a third-party for cash if it had not granted it to Welsh Carson.[6] And if Bridge would have sold the Call Option to a third-party, it could have utilized the proceeds of the

---

**4.** In fact, because the corporation's sale of its stock for less than reasonably equivalent value impairs its ability to raise capital, such a transfer is void under Missouri law with respect to the non-consenting shareholders and the corporation's creditors. *Vogeler v. Punch*, 205 Mo. 558, 103 S.W. 1001, 1004 (1907); *Garrett v. Kansas City Coal Mining Co.*, 113 Mo. 330, 20 S.W. 965, 967 (Mo.1892).

**5.** The Financial Accounting Standards Board ("FASB"), which regulates the accounting practices of publicly traded companies, has recognized this opportunity cost and has promulgated a proposed rule that would require all publicly traded companies to report the market value of the options it grants its employees as an expense at the time of the grant. FASB Statement No. 123, *Accounting for Stock–Based Compensation*. The FASB has also promulgated a rule which mandates that companies report the fair market value of all derivative financial instruments, such as call options, it issues or holds on its financial statements. FASB Statement No. 133, *Accounting for Derivative & Hedging Activities*.

**6.** It is true that there would have been restrictions on Bridge's ability to sell the Call Option because the underlying common stock was not registered. Although such restrictions certainly would have had an effect upon the value of the Call Option, it does not diminish the fact that Bridge incurred an opportunity cost when it granted Welsh Carson the Call Option. *See* Lawrence A. Cunningham, *The Essays of Warren Buffet: Lesson for Corporate America*, 19 CORDZ. L. REV. 5, 199 (1997).

sale to improve its financial condition, which would have benefitted its other unsecured creditors. Therefore, Bridge did incur a cost when it provided Welsh Carson with the Call Option. Accordingly, Bridge did make an otherwise unavoidable transfer to Welsh Carson on account of the $30,000,000.00 in new value under § 547(c)(4)(B) when Bridge granted Welsh Carson the Call Option.

*4. The value of the transfer from Bridge to Welsh Carson on account of the new value is equal to the value of the Call Option on the date Bridge executed the June Convertible Notes.*

The next issue the Court must decide is the value of the transfer Bridge made to Welsh Carson on account of the $30,000,000 in new value under § 547(c)(4)(B). Section 547(c)(4)(B) allows a creditor to offset the debtor's transfer of the preference payment to the extent that the subsequent new value remains unpaid. *Jones Truck Lines, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund,* 130 F.3d 323, 329 (8th Cir.1997). Here, as discussed above, only Bridge's grant of the Call Option was a transfer to Welsh Carson on account of the $30,000,000 of new value under § 547(c)(4)(B). Thus, Welsh Carson may not offset the $30,000,000 in new value against the $20,000,000 in Alleged Preference Payments to the extent of the value of the Call Option.

 Welsh Carson first argues that because Plan Administrator must demonstrate under § 547(b)(3) that Bridge was insolvent at the time it made the Alleged Preference Payments and Bridge executed the June Convertible Notes only four months after make those payments, the value of its common stock underlying the Call Option was worthless when Bridge executed the June Convertible Notes. Thus, Welsh Carson contends that the val-

ue of the Call Option itself was worthless as a matter of law.

 Some courts have held that the equity interest of an insolvent corporation is worthless as a matter of law. *See Green v. Chang (In re C.P.P. Export & Import, Inc.),* 132 B.R. 962, 965 (D.Kan.1991). The better position, however, is that the equity interest of an insolvent corporation may have some value because the equity holders are entitled to share in the corporation's profits if it becomes profitable in the future. *Wabash Valley Power Assoc. v. United States (In re Wabash Valley Power Assoc.),* 72 F.3d 1305, 1318 (7th Cir.1995) (*citing Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 208, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)).

As Plan Administrator points out, because the value of a call option is derivative of the value of the underlying stock, the value of a call option on the stock of an insolvent corporation is not worthless as a matter of law. Therefore, the Call Option was not worthless as a matter of law even if Bridge was insolvent at the time it executed the June Promissory Notes.

 Welsh Carson also argues that it is entitled to offset the entire $30,000,000 in new value against the $20,000,000 in Alleged Preference Payments because its right to convert the debt into Bridge's common stock is now worthless. The court, however, must examine the transaction at the time it was made in evaluating whether the debtor transferred something of value to the creditor under the preference statute. *Drewes v. FM Da–Sota Elevator Co.,* 939 F.2d 654 (8th Cir.1991). Thus, the fact that the asset transferred may become worthless at some point after the transfer is not relevant to whether it has value at the time of the transfer. *See Chomakos v. Hilton (In re Chomakos),* 69 F.3d 769, 771 (6th Cir.1995) *cert. denied*

517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996). (Holding that in evaluating whether debtor received reasonably equivalent value under § 548(b), a court must examine the transaction at the time of the transfer). Accordingly, the fact the Call Option proved to have no value to Welsh Carson is not relevant to whether Bridge transferred something of value to Welsh Carson in exchange for the $30,000,000 in new value under § 547(c)(4)(B).

■■■ Plan Administrator takes the opposite position and argues that because Welsh Carson was willing to accept the June Convertible Notes in exchange for the $30,000,000 in new value, Welsh Carson has been fully compensated for the $30,000,000. The Court would agree with Plan Administrator's theory if Bridge had only provided Welsh Carson with the Call Option in exchange for the $30,000,000. As noted above, however, the June Convertible Notes were hybrid financial instruments that contained both an unsecured debt and an option component.

Conceptually, these two components are discrete and must be valued separately. For example, under the Internal Revenue Code ("IRC"), the issuer of a convertible debt instrument must treat the value of the options contained in the financial instrument as an ordinary business expense and deduct it from its gross income and the recipient must treat the value of the option as ordinary income. 26 U.S.C. §§ 163(e)(1); 1273(c)(2); *Custom Chrome, Inc. v. Comm'r of Internal Revenue*, 217 F.3d 1117, 1121–22 (9th Cir.2000). The rational underlying this rule is that the value of the options contained in the convertible debt instrument is separate consideration apart from the debtor's unse-

cured obligation to repay the principal amount of the loan.[7] *Id.*

Likewise, under proposed FASB Statement No. 133, the parties to a transaction involving a convertible debt instrument must separate the value of the option from the value of the unsecured debt for accounting purposes. Specifically, the value of the option component of the convertible debt instrument must be accounted for as a derivative financial instrument while the unsecured debt component must be accounted for as ordinary unsecured debt. *See* Ensminger, *supra* text accompanying notes 52–53.

Following the logic of bifurcating the convertible debt instruments into its component parts for valuation purposes embodied in both the IRC and FASB Statement No. 133, the Court finds that the unsecured debt component and the Call Option in the June Convertible Notes had discrete values. Also, only the Call Option was a transfer to Welsh Carson under § 547(c)(4)(B) in exchange for the $30,000,000 in new value and there is no evidence in the record at this point as to the value of the Call Option. Thus, the Court cannot accept Plan Administrator's theory that Welsh Carson was fully compensated as a matter of law for the $30,000,000 in new value it provided to Bridge.

*E. There are material issues of fact in dispute as to the value of the transfer Bridge made to Welsh Carson on account of the $30,000,000 in new value.*

■■■ As just illustrated, only Bridge's grant of the Call Option constituted a transfer from Bridge to Welsh Carson on account of the $30,000,000 in new value for purposes of § 547(c)(4)(B). Also, there is

---

**7.** Such a premium is defined as an original issue discount ("OID") under the IRC. *Cus-*

*tom Chrome,* 217 F.3d at 1121.

no evidence in the record as to the value of the Call Option. Thus, there are material issues of fact in dispute concerning Welsh Carson's subsequent new value defense under § 547(c)(4). Therefore, Welsh Carson is not entitled to summary judgment under Fed.R.Civ.P. 56(c).

The Court does note as a practical matter, one possible method for valuing the Call Option is to measure the difference between the value of the stream of payments that Bridge would have had to make to Welsh Carson at the 8% interest rate on the June Convertible Notes versus the value of those payments at an interest rate Bridge would have had to offer to potential lenders on its unsecured subordinated debt without a right to convert the debt into equity. *See Monarch Cement Co. v. United States,* 634 F.2d 484, 485 (10th Cir. 1980). This method may be particularly appropriate here because the original April Notes, which did not give Welsh Carson the right to convert, carried a rate of interest of 12% *per annum.*

■ There are, however, a number of other possible techniques to value the Call Option and the Court does not mean to preclude the possible application of these other valuation methods. *See generally Custom Chrome,* 217 F.3d at 1124 n. 10. The Court also notes that because Welsh Carson has the burden of proof on its subsequent new value defense, it bears the burden to proof on this issue.

*F. The Court will not stay discovery*

Welsh Carson has also filed a motion to stay discovery pending the Court's ruling on its motion for partial summary judgment. Because Welsh Carson is not entitled to summary judgment, its request to stay discovery will be denied.

Plan Administrator filed a motion to compel Welsh Carson to fully answer certain interrogatories that Plan Administra-

tor has propounded to it. At the hearing on this motion, Welsh Carson indicated that it had proffered answers to those interrogatories to Plan Administrator. Accordingly, the Court will deny Plan Administrator's motion to compel. Plan Administrator may, of course, renew this motion if he believes that Welsh Carson has not fully answered the interrogatories.

**CONCLUSION**

There are no material facts in dispute that the $30,000,000 in cash that Welsh Carson provided to Bridge subsequent to receiving the Alleged Preference Payments is new value under § 547(a)(2) and that Welsh Carson provided that new value on an unsecured basis. Also, there are no facts in dispute that the June Convertible Notes contained two discrete components; the unsecured debt and the Call Option. And only the Call Option constitutes a transfer from Bridge to Welsh Carson on account of the $30,000,000 in new value for purposes of § 547(c)(4)(B). Thus, for purposes of Fed.R.Civ.P. 56(d), the Court finds that these facts are without substantial controversy and shall be deemed established.

There is, however, no evidence in the record as to the value of the Call Option. Thus, there are material facts in dispute as to the amount of the $30,000,000.00 of subsequent new value that Welsh Carson may offset against the $20,000,000 in Alleged Preference Payments. Therefore, Welsh Carson's motion for partial summary judgment will be denied. Further, the Court will deny Welsh Carson's motion to stay discovery and Plan Administrator's motion to compel discovery.

An Order consistent with this Memorandum Opinion will be entered this date.