FabricaNt, Judith, J.
INTRODUCTION
This is an action for legal malpractice in connection with misrepresentations in a registration statement filed with the Securities and Exchange Commission (SEC), and related statements. The plaintiff company contends that the defendant law firm’s conduct *425 caused the SEC to suspend trading in the company’s stock, and that the suspension caused a drop in the company’s share price. The plaintiff seeks damages measured by the drop in share price, as well as other damages. Before the Court is the defendant law firm’s motion for summary judgment with respect to that aspect of the plaintiffs claims. For the reasons that will be explained, the motion will be allowed.
BACKGROUND
The plaintiff, Vaso Active Pharmaceuticals, Inc., was incorporated in January 2003, as a wholly-owned subsidiary of BioChemics, Inc. Vaso describes its business as “commercializing over-the-counter pharmaceutical products developed by BioChemics and manufactured by an independent third party.” John Masiz, a Massachusetts attorney, founded BioC-hemics in 1989, and at all relevant times has been its chairman, chief executive officer, and majority shareholder. He was also Vaso’s first chief executive officer.
In the mid-1990s, Masiz obtained, and transferred to BioChemics, three patents for a technology he has labeled “VALE,” for “Vaso Active Lipid Encapsulated.” Masiz has described VALE as “a liquid needle,” that is able to “introduce drugs into the bloodstream in an efficient and highly effective manner,” and as a “platform technology” that can be applied to “a myriad of drugs.” BioChemics developed skin-care products, to be sold over the counter, which it claimed utilized the VALE technology.
After its incorporation in January 2003, Vaso entered into a license agreement with BioChemics for the use of the VALE technology, subject to the limitation that the products it would market would be classified by the Food and Drug Administration (FDA) as over-the-counter, arid would “require less than one million dollars ($1,000,000) of clinical development,” an amount that would not be sufficient to undertake the process required for FDA approval of a new drug. The two companies also entered into a marketing and development agreement, under which BioChemics would develop products for Vaso.
Vaso engaged Robinson & Cole to represent it in connection with an initial public offering of its stock. Robinson and Cole drafted and filed a registration statement and prospectus. The registration statement identified the three products that BioChemics had developed, claimed superior performance of one of the products over competing products, and discussed the terms of the license agreement between Vaso and BioChemics, a copy of which was submitted with the registration statement. The registration statement asserted that the VALE system offered advantages over other forms of drug delivery, and that it was protected by BioChemics’ patents. It went on to say that the three products “have been through the research and development, pre-clinical trial study and clinical trial stages and have received FDA approval.”
The parties agree that the statement that the products had “received FDA approval” was materially misleading. None of Vaso’s products had received FDA approval; Vaso’s intention was to market them as new applications of already approved active ingredients under FDA monographs for those ingredients. The record includes evidence from which a juiy could find that the decision to include the misleading statements, and not to include a full explanation of the regulatory process and its costs and risks, constituted malpractice by Robinson & Cole.
Vaso’s IPO was completed on December 15, 2003, at a price of $1.66 per share, netting $6.4 million to Vaso. Before and after the IPO, the company, and Masiz on its behalf, made a series of statements to the public and to investors about the company’s plans and prospects, including the regulatory status of its products. The record includes evidence from which a jury could find that some of those statements were misleading, and also that they were attributable, at least in part, to negligent advice by Robinson & Cole.
Vaso’s stock began to rise in February 2004, and reached a closing high of $14.11 per share on March 3, 2004. During the same period, however, news media reports began to appear raising questions about the company. In early March, the SEC contacted Vaso and made inquiries. Vaso’s annual report filed with the SEC by Robinson & Cole on March 26, 2004, stated that the company’s products had “been through the research and development stage and are qualified under FDA OTC monographs and have been registered as such.” As of the end of March, Vaso’s stock price had fallen to $7.59 per share.
On April 1, 2004, the SEC announced that it had temporarily suspended trading in Vaso’s stock “because of questions regarding the accuracy of assertions by [Vaso] and others, in press releases, its annual report, its registration statement and public statements to investors concerning, among other things: (1) FDA approval of certain key products, and (2) the regulatory consequences of the future application of their primary product.” On April 2, 2004, The Boston Globe reported that none of Vaso’s products had been approved by the FDA. Also on April 2, 2004, TheS-treet.com, an on-line financial newsletter, commented that Vaso might not be able to sell its products incorporating its new technology without first completing a “time consuming and expensive” FDA approval process that neither Vaso nor BioChemics had initiated. On April 7, 2004, Vaso issued a press release announcing that it intended to issue revised disclosures, and warning investors not to rely on its prior SEC filings and public statements. On April 8, 2004, Vaso’s board of directors voluntarily delisted its stock from the NASDAQ. On that same day, shareholder Dennis E. Smith filed the first of several shareholder class action lawsuits against Vaso. The SEC lifted its trading suspension on April 15, 2004. Vaso stock was then *426 available for public trading, but was not listed on any national exchange. The closing price for Vaso shares on April 16, 2004, was $1.75 per share.
During the suspension, Vaso hired new counsel, a Washington firm that specialized in FDA law. With the assistance of its new counsel, in July of 2004 Vaso filed with the SEC an amended annual report, in which it acknowledged that the FDA had taken the position that “insofar as our products or product candidates use a transdermal technology” Vaso “must obtain NDA [New Drug Application] approval of the products before they can be commercially marketed,” that the NDA approval process “typically takes several years” and involves “substantial” costs, and that approval might not be achieved. The amended annual report deleted claims that Vaso’s over-the-counter products incorporated the VALE system, saying instead that the products used a “PENtoCORE technology [that] does not achieve its effect by delivering the drug through the skin and into the bloodstream.” The amended report also deleted claims of superiority of the products, saying instead that the “PENtoCORE technology . . . may enable the formulation of topical products that are pleasant to use because they do not have the odor, greasy feel or residue often associated with other topically applied drug products.” The amended report also removed any claim that the products used a patented technology.
In August 2004, the SEC filed a civil action against Vaso and Masiz, alleging that they had made false and misleading statements in violation of federal law by claiming FDA approval in the registration statement, on Vaso’s website, and in the annual report. Vaso and Masiz immediately entered into settlement agreements with the SEC, under which Masiz paid a fine of $80,000 and agreed to refrain from serving as an officer or director of a public company for five years. He resigned as an officer and director of Vaso, but remained as a consultant at the same salary.
In September 2005, Vaso settled the stockholder suits for $1.1 million in cash, plus $750,000 in two-year, subordinate callable notes convertible to Vaso stock at $1.75 per share. Vaso later defaulted on the notes, which the shareholder class then sold at 16% of their face value to VNA Holdings, Inc., described as “a corporation controlled by non-executive employees of BioChemics.”
Vaso and Biochemics filed this action on November 29, 2006. The complaint sets forth five counts on behalf of Vaso: breach of contract (count one), professional negligence (count two), intentional misrepresentation (count three), negligent misrepresentation (count four), and breach of fiduciary duty (count five).[2] The complaint seeks compensatory damages, which it identifies as including, among other components, the change in Vaso’s market capitalization as a result of the drop in its stock price that occurred upon the SEC’s suspension of trading. In an interrogatory answer Vaso has clarified that it seeks, among other elements of damages, “the decrease in the price per share of its securities multiplied by the number of outstanding shares of its common stock” from the close of trading on March 31, 2004, to the close of trading on April 16, 2004, a total of $60,143,847.
DISCUSSION
Summary judgment will be granted when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56; Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). Summary judgment may properly be granted as to “all or any part” of “a claim, counterclaim, or cross-claim” either on behalf of or against the moving party. Mass.R.Civ.P. 56(a) and (b). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Mass.R.Civ.P. 56(c); Community Nat’l Bank, 369 Mass. at 553. The Court views the facts “in the light most favorable to [the non-moving party], taking all the facts set forth in its supporting affidavits as true.” G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991).
The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts that establish the existence of a genuine issue of material fact. Mass.R.Civ.P. 56(e); see Godbout v. Cousens, 396 Mass. 254, 261 (1985); Madsen v. Erwin, 395 Mass. 715, 719 (1985). The non-moving party cannot defeat the motion by resting on pleadings and mere assertions of disputed facts, but must offer evidence that would be admissible at trial. LaLonde v. Eissner, 405 Mass. 207, 209 (1989); see also Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987) (“[i]f the opposing party fails properly to present specific facts establishing a genuine, triable issue, summary judgment should be granted”).
Robinson & Cole’s motion addresses that part of each of Vaso’s claims that seeks to recover damages measured by the fall in stock price that occurred in connection with the SEC’s suspension of trading in Vaso’s stock. The defendant makes three arguments: (1) Vaso cannot show that better work on the part of the law firm would have achieved a better result, because the misrepresentations caused the stock price to be inflated prior to the suspension; (2) the cause of the reduction in stock price was not any act or omission by the law firm, but rather the disclosure of the adverse information that the misrepresentations had concealed; and (3) the decline in stock price was an injury suffered not by Vaso, which did not own *427 the stock, but by its shareholders, who did. The Court will address the third argument first, and then turn to the other two, which are intertwined, both falling under the rubric of evidence of causation.
1. Whose Injury
As the defendant correctly points out, Vaso did not own its shares, and therefore cannot have been harmed directly by a change in its share price; that harm fell to the shareholders, who did own the shares. See Struogo v. Bassini, 282 F.3d 162, 175 & n. 10 (2d Cir. 2002); Howard v. Haddad, 916 F.2d 167, 169-70 (4th Cir. 1990); In re Bridge Information Sys., Inc. 311 B.R. 781, 788 (Bankr.E.D. Mo. 2004). It does notfollow that conduct that caused the drop in share price did not cause any harm to Vaso. Vaso’s shareholders could and did sue the company for the misrepresentations, and the company incurred costs to defend and settle those suits; those costs, as well as other costs arising from the misrepresentation, may be recoverable against Robinson & Cole. But the drop in share price in itself is not injury to Vaso, and cannot be a direct component of Vaso’s damages.
Vaso’s primary response to this issue is to point out that the shareholders would not have standing to sue Robinson & Cole, since the firm’s duly was to the corporation, not to the shareholders directly. That is true, but irrelevant. Regardless of who, other than Vaso, may or may not have standing to recover for losses sustained, Vaso can recover only for its own injury.
Vaso’s fail-back position is that the drop in its share price provides a fair estimate of the injury to Vaso, insofar as it reflects the decrease in the value of Vaso as an on-going business. See In re Sunrise Sec. Litig., 916 F.2d 874, 886 (3d Cir. 1990) (“decreases in share value reflect decreases in the value of the company”), citing Rand v. Araconda-Ericson, Inc., 794 F.2d 843, 849 (2d Cir. 1986), cert denied, 479 U.S. 987 (1986); Windsor Shirt Co. v. N.J. Nat Bank, 793 F.Sup. 589, 595-96 (E.D.Pa. 1992) (“market capitalization of all the shares of a company’s stock represents the approximate market value of the company,” although “the more inefficient the market, the more divergence there may be between the market capitalization of a company, as represented by the sum of the market price of all its shares, and its ‘true’ value, as measured from the perspective of a fully-informed buyer in a perfectly efficient market”). This might be so, but the burden is on Vaso to prove it. The Court therefore turns to the question of whether Vaso has offered evidence indicating a genuine dispute of material fact as to whether Robinson & Cole’s conduct caused harm to Vaso that can fairly be measured by the drop in its market capitalization.
2. Causation
To recover on a claim for legal malpractice, a plaintiff must show both that the attorney failed to provide services in accord with the applicable standard, and that “he probably would have obtained a better result had the attorney exercised adequate skill and care.” Poly v. Moylan, 423 Mass. 141, 145 (1996), citing Fishman v. Brooks, 396 Mass. 643, 647 (1986). To put it differently, the plaintiff must show that the attorney’s negligence proximately caused the loss for which the plaintiff seeks recovery. McCann v. Davis, Malm & D’Agostine, 423 Mass. 558, 560 (1996); Baghdady v. Lubin & Meyer, P.C., 55 Mass.App.Ct. 316, 320-21 (2002); Atlas Tack v. Sonabed, 47 Mass.App.Ct. 221, 226 (1999), citing Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, 25 Mass.App.Ct. 107, 111 (1987). To make this showing, the plaintiff must present evidence to answer an essentially hypothetical question: what would have happened but for the attorney’s negligence? Generally, although not in every instance, expert testimony is required to address that question. See Atlas Tack v. Donabed, 47 Mass.App.Ct. at 226-27 (expert engineer required to show merits of underlying claim of engineering malpractice); Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, 25 Mass.App.Ct. at 112-16 (expert testimony necessary to establish that if not for attorney’s negligence plaintiff would have succeeded in obtaining injunction against labor picketing); compare Fishman v. Brooks, 396 at 647 (jury could determine without expert testimony whether plaintiff would have prevailed in underlying motor vehicle tort case).
Here, Vaso offers two expert reports, one on liability and one on damages. Vaso’s liability expert, Attorney Donald Glazer, opines that Robinson & Cole breached the applicable standard of care by failing to conduct a thorough review of the accuracy of all statements regarding FDA matters, and by failing to bring in lawyers with expertise in FDA regulation. Glazer does not express any opinion with respect to any injuiy that resulted from the law firm’s negligence.
Vaso’s damages expert, economist James V. Koch, begins his report by reciting the task he was asked to perform, as follows:
I was asked to estimate the amount of financial harm suffered by Vaso Active as a consequence of the decision by the U.S. Securities and Exchange Commission (“SEC”) to halt trading in Vaso Active stock on 1 April 2004.1 was also asked to assume that the law firm of Robinson & Cole . . . bears responsibility for the wrongful acts and misrepresentations that triggered the SEC suspension order and that such order was the proximate cause of Vaso Active being delisted from the NASDAQ Exchange, as well as the filing of a number of class action lawsuits against Vaso Active and certain of its directors and officers.
Koch then goes on to describe a series of event studies he undertook to estimate the damages resulting from the suspension order. Such studies, he reports, “flow *428 from two principles: one, markets are efficient and two, the price of a traded stock is roughly equal to the present discounted value of its free cash flow.” He explains the efficiency principle as based on the absence of barriers to entry, and the wide availability of information, such that “equity prices quickly adjust to new information.” He acknowledges, however, that “analysis and investor quirks on occasion may result in price bubbles in a few stocks or market segments.” He does not purport to determine whether that may have occurred with respect to Vaso stock.
Koch undertook to control for external events by “estimating a regression in which the daily return on a share of Vaso Active stock is made a function of the daily return of an overall equity stock index.” To control for industry-specific factors, he “constructed an industry index and regressed both the market equity index and the industry index on Vaso Active’s stock returns,” but he found that “the addition of an industry variable did not add any additional explanatory power" to the analysis. He therefore reports his regressions “using only the overall equity market index as a control variable.” He conducted his analyses using four different “estimation windows” between December 16, 2003, and March 31, 2004, and comparing prices for those periods with a period of four days after trading resumed. His results, he reports, show that the trading suspension “had a significant impact (both statistical and economic) on Vaso Active’s share price” in the form of “statistically significant abnormal returns.” Averaging the results for the four estimation windows, he concludes that the trading suspension resulted in a reduction in Vaso’s total market capitalization of $68.1 million.
Koch also performed “cash flow projections,” through which he estimated an amount per share that profits on each of Vaso’s products would generate. He included in this analysis not only the products Vaso had actually marketed, but the six products that its registration statement described as under development. He applied a set of assumptions, the basis for which he does not identify, including that Vaso would capture 2.5 percent of the market for wholesale sales for each of its products, that its sales would grow between three and five percent each year for ten years, and that it would realize a 20 percent profit margin. This analysis led him to the conclusion that Vaso’s products would have generated profits per share amounting to a total of $78.3 million. As he notes, however, “[bjecause the discounted future profits approach to damage estimation is based upon projections of sales not yet made and markets not yet penetrated, it is not as rigorous as the event study methodology, which is based solidly upon the actual behavior of market investors.”
Quite understandably, given the assumptions Koch recites at the outset, his report does not address the possibility that the drop in share price resulted, at least in some part, from facts specific to Vaso and separate from the suspension order or from any conduct of Robinson & Cole. In particular, Koch does not address the role, if any, of the disclosure of truthful information in contradiction to the misleading statements that triggered the suspension order. He does not attempt to determine what would have happened to the stock price, before or after the suspension, if those disclosures had occurred without the suspension order. Put differently, he does not purport to address what would have happened but for Robinson & Cole’s alleged negligence in making the misleading statements. In substance, Koch assumes the facts that the plaintiff must prove to establish causation.
In response to Koch, Robinson & Cole offers the report of economist David Gulley. Gulley opines that Vaso’s share price and market capitalization “are completely unreliable as the basis for a damages claim” because “the information set available to the market contained false and misleading information,” so that share price did not reflect the company’s “true value" during the period in question. To the contrary, in his view, Vaso’s share price before the suspension was consistent with a “speculative bubble,” caused by a number of factors, one of which was the dissemination of misleading information, particularly about FDA approval which “is a significant driver of share prices.” Koch’s report, Gulley opines, fails to establish any loss causation resulting from Robinson & Cole’s conduct, because it erroneously assumes that the company’s share price before the suspension reflected its true value, and fails to consider what would have happened absent the law firm’s negligence. Koch’s analysis, Gulley opines, does not show that Robinson & Cole’s conduct caused any change in “the true financial condition and prospects of the company.” The price decline after trading resumed, in Gulley’s view “is easily explained as the correction in the false information set.” As to Koch’s cash flow analysis, Gulley opines that it is “speculative and unreliable,” because it depends on unsupported assumptions about the company’s financial potential.
Robinson & Cole argues that the undisputed facts establish that its conduct did not cause the drop in Vaso’s share price. To the contrary, it contends, the undisputed facts establish that, if it had performed its services as Vaso’s liability expert opines that it should have — that is, if it had uncovered and disclosed the truth about Vaso’s lack of FDA approval for its products — Vaso’s share price would never have reached the level it did before the suspension, and no drop would have occurred. Although the only expert opinion that addresses the point supports that view, the Court need not go that far, because Vaso has offered no basis on which a factfinder could exclude from the causation analysis the effect of the misrepresentation on inflating the share price, and the effect of the subsequent disclosure of the truth on its decline. The evidence Vaso offers is thus insufficient to meet its burden to *429 prove that Robinson & Cole’s conduct caused the drop in share price.
In the context of shareholder claims for securities fraud, federal law requires the plaintiff to prove that the fraud caused economic loss. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342-44 (2005); 15 U.S.C. §78u-4(b)(4). In Dura, the Supreme Court held that a plaintiff cannot meet that requirement merely by showing that the share price at the time of purchase was inflated by the misrepresentation. Rather, the plaintiff must separate out the fraud from “the tangle of factors affecting price,” so as to establish causation. Id., 544 U. S. at 343. See also Lentell v. Merill Lynch & Co., 396 F.3d 161, 162-253 (2d Cir. 2005) (plaintiff must prove loss causation); In re Omnicon Group, Inc. Securities Litigation, 541 F.Sup.2d 546, 553-54 (S.D.N.Y. 2008) (“To prove loss causation, plaintiffs must distinguish the alleged fraud from the ‘tangle of [other] factors’ that affect a stock’s price”; “Because the law requires the disaggregation of confounding factors, disaggregating only some of them cannot suffice”) (emphasis in original), citing Dura, 544 U.S. at 343.
This case does not present shareholder claims for fraud, but the requirement of proof of causation is similar. To prove its theory of damages measurable by the change in share price, Vaso must separate out Robinson & Cole’s conduct from the various other factors affecting share price at the relevant times. The evidence it offers, particularly the Koch report, attempts to separate out changes in share price in the market in general, and in the relevant industry segment in particular. It does not, however, make any effort to account for inflation in share price arising from the false information, and subsequent elimination of that inflation upon dissemination of the truth. Without evidence to accomplish that, Vaso cannot meet its burden of proving that Robinson & Cole caused harm to Vaso measurable by the reduction in its share price.
Vaso argues that a jury could draw the necessary conclusions without expert testimony. The Court does not agree. Vaso’s theory of damages measurable by the drop in share price, based on the premise that share price represented an accurate reflection of Vaso’s value before the drop, and that Robinson & Cole’s conduct caused the drop, requires evaluation of matters that are beyond the knowledge and experience of lay jurors. See Atlas Tack v. Donabend, 47 Mass.App.Ct. at 227; Adair v. Kay Kotts Associates, Inc., 1998 WL 142353 (S.D.N.Y.) *6; Cagan v. Anchor Savings Bank, 1990 WL 73423 (E.D.N.Y.) *7; In re Saxon Securities Litigation, 1985 WL 48177 (S.D.N.Y) *7. In the absence of expert evidence on the issue, Vaso cannot meet its burden of proof, and Robinson & Cole is entitled to summary judgment on this aspect of Vaso’s claims.
CONCLUSION AND ORDER
For the reasons stated, Robinson & Cole LLP’s Motion for Partial Summary Judgment is ALLOWED.

 The complaint sets forth five additional counts on behalf of Biochemics, alleging the same causes of action. Those counts are not the subject of this motion.